IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to: | ) | No. 38168-4-III |
| | ) | (consolidated with |
| L.P. | ) | No. 38169-2-III) |
| | ) | |
| | ) | UNPUBLISHED OPINION |
| | ) | |

STAAB, J. — This appeal concerns the termination of parental rights for the

parents' youngest son, L.P. The family unit consists of the parents and their six children.

When the dependency petition was filed, three sons and one daughter were adults. One

minor daughter, R.P., and one minor son, L.P., remained in the home. The dependency

was filed after an adult daughter, A.P. disclosed that she had been repeatedly raped by her

father and one of her older brothers while growing up. The younger daughter, R.P., later

confirmed that she was also the subject of sexual abuse by her father and another brother.

The parents do not dispute the order terminating their rights to R.P.

During the dependency, the Mother[1] refused to acknowledge that the abuse

occurred and had taken the position that she would not sever her relationship with her

---

[1] For clarity and readability, we refer to each parent as "the Father" and "the Mother."

husband or sons. While both parents participated in some of the ordered services during the dependency, they refused services directly related to the abuse. After three years, the Department of Children, Youth and Families (Department) petitioned for termination of the parental rights of the parents to their youngest son, L.P. At the termination trial, the court found that the Father and two oldest sons sexually abused the two female children, A.P. and R.P. The court also found that despite overwhelming evidence of the abuse, the Mother refused to acknowledge its possibility, refused to leave her husband for the safety of the children, and would therefore be unable to protect her children from the Father. The superior court concluded that the Department had proved all statutory and constitutional factors necessary for termination of the parental rights to L.P.

On appeal, the parents contend that the Department failed to prove the statutory factors establishing lack of fitness, particularly that necessary services were not offered or provided to help them to correct their parenting deficiencies. They further challenge whether termination was in the best interests of L.P. The Mother also argues that she was not notified, in violation of her due process rights, that her physical mobility was a parental deficiency. The parents contend that the sexual abuse remains unproven, and L.P. is not in danger since he is male and has never been abused. We disagree and affirm the order terminating the parental rights to L.P.

BACKGROUND

The following facts are taken from the trial court findings, trial exhibits and trial testimony.

The parents have been married since 1990 and have six children: one minor son, L.P. (age 10 at time of trial); one minor daughter, R.P.; one adult daughter, A.P.; and three adult sons, C.P., B.P., and N.P. The Father is the sole financial provider of the family. The Mother has physical limitations that impede her mobility and limit her ability to work outside the home.

In July 2017, when she was 21 years old, the parents' adult daughter, A.P., called Child Protective Services (CPS) alleging that her father had sexually abused her and her younger sister, R.P.[2] A.P. told CPS that her adult brother, C.P., had also been abused by her father. R.P. confirmed her own abuse by her father and added that she had been raped by her older brother, B.P. The Father admitted to some inappropriate touching but claimed that A.P. initiated it. He denied sexual intercourse with A.P. and any sexual contact with R.P.

The Father admitted that A.P. previously disclosed her sexual abuse at a family meeting. The Mother denied any prior knowledge of sexual abuse allegations and denied that A.P. had disclosed the abuse during a prior family meeting. She denied that the

_____

[2] A.P.'s age at the time of referral is calculated from her date of birth.

Father had sexually abused any of their children. Both parents accused A.P. of having "mental problems." Clerk's Papers (CP) at 176. R.P. and L.P. were subsequently removed from the home and ultimately placed together with a foster family whose home was deemed safe, stable, and appropriate. The parents were granted supervised visits with L.P.

During an August 2017 family team decision meeting (FDM) with the Department, A.P. and R.P. again disclosed sexual abuse in the home. A.P. repeated an earlier allegation that C.P. had been sexually abusing her after seeing their father abuse A.P. The Mother continued to deny that the Father had abused any of their children. The parents refused the suggestion that the Father move out of the family home.

In October 2017, the Department and the parents agreed to the entry of dependency disposition orders for R.P. and L.P. The dependency safety concerns identified by the Department included: (1) the Mother was in complete denial that this could have happened to her children and could not be vigilant, (2) two older brothers had sexual contact with both daughters, and (3) L.P. is at a vulnerable age. RP (Oct. 29, 2020) at 692-93.[3] The Department determined that the Father's primary parental deficiency was

---

[3] The record on appeal does not contain the dependency petition so it is unclear what specific allegations it contained. However, the alleged abuse by C.P. was not the Department's focus as reflected by the overall record.

sexual abuse of the children. The Mother's primary parental deficiency was her failure to protect the children from sexual abuse.

The dependency disposition order for L.P. ordered services for the parents. Family counseling was not a necessary service capable of correcting the parental deficiencies of the parents in the foreseeable future.

THE FATHER

The Department met with the Father to discuss his service plan. Ordered services included sexual deviancy evaluation with polygraph, psychological evaluation, parenting education, and mental health treatment. A polygraph is an essential tool in sexual deviancy evaluations.

The Father submitted to a sexual deviancy evaluation with Ken Schafer in November 2017. The Father understood all services required of him but refused the court-ordered polygraph. Mr. Schafer was aware of the allegations of abuse against C.P. He felt that questions specific to every sibling, including C.P., were necessary on the polygraph. Mr. Schafer's report indicated that the Father "opted to not participate in a polygraph assessment even though it was fully funded by DSHS [Department of Social & Health Services]." Ex. 37 at 2. The Father told Mr. Schafer that:

> [H]e does not believe that it would be beneficial as he does not trust the outcomes; it is not admissible in court; and that he has enough character witnesses to attest that he has done nothing wrong with any of his children.

> [The Father] was made fully aware that his choice to not participate in the polygraph may also be detrimental to him . . . . [The Father] indicated that he understood the possible ramifications of his choice to not participate in a Sexual History Polygraph examination.

Ex. 37 at 11. The Father's refusal to submit to a polygraph limited Mr. Schafer's assessment to the Father's self-reports. According to Mr. Schafer, the Father presented himself in an "overly virtuous manner." CP at 180 (FF 2.14.37). He primarily worried for himself and showed little to no concern for his minor daughter. Mr. Schafer did not recommend a parenting course or mental health assessment based on the Father's complete denial of sexual abuse and unwillingness to take responsibility for his actions. For the same reasons, Mr. Schafer found that the Father was not amenable to any treatment. He also felt sexual deviancy treatment would be futile. The court found Mr. Schafer's opinion to be compelling.

As of June 2018, the Father was not compliant with completing his sexual deviancy evaluation due to his failure to submit to a polygraph examination. The court ordered him to finish a polygraph "per Ken Schafer." Ex. 6 at 12. The Father testified that he was not comfortable with Mr. Schafer and decided to arrange an independent polygraph because he understood that it was ordered by the court. Mr. Schafer later became aware of the Father submitting to two polygraphs with another provider. He was not contacted to participate in them and thus did not consider it an adequate substitute to complete his own assessment. Mr. Shafter felt that "significant issues [were] identified

6

through this—this whole process. I don't think it's normative to have that many individuals . . . associated with [the Father] . . . that are indicating some—some level of sexual mistreatment, sexual abuse being conducted by a family member." RP (Oct. 26, 2020) at 283-84. These red flags made Mr. Shafer question whether the environment in the Father's home would be safe for any child regardless of gender.

The Father had a psychological evaluation in December 2017 with Dr. Jameson Lontz. Dr. Lontz found the Father's self-reporting regarding the sexual contacts with A.P. inconsistent. Dr. Lontz found that the Father demonstrated a moderate sexual violence reoffense score, counting sexual contact with children as sexual violence for scoring purposes. It was based on the Father's history, attitudes, and insights. Dr. Lontz diagnosed the Father with passive-aggressive presentation and paraphilic disorder, which are personality disorders that are difficult to treat. Paraphilic disorder means "intense sexually arousing fantasies, urges, or behaviors that involve sexual activity with prepubescent people." RP (Oct. 26, 2020) at 395. Dr. Lontz opined that violent acts against one vulnerable group increase the risk of violent acts against other vulnerable individuals. Treatment prognosis depends on volition, and the Father demonstrates denial of abuse and lack of insight, making his prognosis poor.

Dr. Lontz did not recommend a parenting course because it would not resolve the Father's sexual abuse or change his lack of concern for his daughter. Dr. Lontz also

7

opined that individual counseling would be futile because the Father would not be willing to engage. He did not think the Father should be left alone with any children. Child gender did not modify Dr. Lontz's opinion that termination of parental rights was appropriate. The trial court found the testimony of Dr. Lontz credible and compelling.

On February 11, 2019, the State charged the Father with two counts of first degree rape of a child, one for each of his daughters, one count of first degree incest, and one count of first degree child molestation. Contemporaneously, C.P. was charged with one count of first degree incest and one count of third degree rape of a child, for his sister A.P. B.P. was charged with one count of first degree incest and one count of first degree rape of a child, for his sister R.P. The Father entered a stipulated order of continuance of a third degree rape charge on February 24, 2020. The parties stipulated that the charge would be deferred and later dismissed if the Father complied with certain conditions.[4]

The Father had another psychological evaluation in September 2019 with Dr. Loren McCollom. The evaluation was completed in March 2020. Dr. McCollom did not have independent information from the Department, however he generally concurred with Dr. Lontz's evaluation. He did not make recommendations for L.P. because both times

---

[4] Count 1 was at some point amended from first degree to third degree rape of a child. The third degree rape charge was dismissed in March 2021 after the termination trial and letter decision, but before the court filed its formal findings.

that he tried to administer a "child abuse potential inventory" for the Father, the results were invalidated due to an "overly positive response pattern." RP (Oct. 27, 2020) at 636.

The Father sought his own sexual deviancy evaluation in the summer of 2020 from Jason Bailey. Mr. Bailey did not receive information on the case from the Department. The Father did not notify the Department prior to the evaluation.[5] Mr. Bailey was provided with the reports of Ken Schafer, Dr. McCollom, police reports, and some Department records by the Father's attorney. Mr. Bailey did not consider the existence of any male victims even though that is a point risk factor because "there wasn't substantial information regarding the case material to really discuss this." RP (Oct. 30, 2020) at 952-53. His polygraph questions asked about the daughters' allegations, but he did not ask questions about C.P. or any other male in the household.[6] Mr. Bailey knew about L.P.'s dependency. The tests he utilized assume that the examinee is a sex offender.

Mr. Bailey found the Father to be "level two" for supervision, a "below average risk" to reoffend in the community. RP (Oct. 30, 2020) at 930. Based on his data and the Father's stance on the allegations, he concluded that specialized sex offender treatment was inappropriate. The Father's treatment would likely be terminated even if referred due

---

[5] Findings of fact 2.14.44 and 2.14.41 are nearly identical but the Father only challenges the latter.

[6] The polygraph answers were not considered by the trial court for the truth of the matter as stipulated by the parties.

9

to his low motivation and denial.  Ultimately, the Father completed all of his court-ordered services except the sexual deviancy evaluation with Ken Schafer, and did not sign releases for his mental health counselor.

THE MOTHER

The Department met with the Mother in September 2017 to discuss the service plan with her.  The ordered services for the Mother included parenting education at Incredible Years, psychological evaluation with a parenting component, a parenting assessment, release of information, mental health counseling, and individual domestic/sexual violence therapy through SAGE (safety advocacy growth empowerment).  The individual therapy through SAGE was ordered one week later after the court found that it was necessary to address the Mother's childhood sexual abuse as well as her response to the disclosed sexual abuse of her own children.[7]

Jessica Johnson of SAGE met the Mother in November 2017.  The Mother completed the initial phase of a 10-week domestic violence course with SAGE.  SAGE accommodated the Mother's mobility needs during the dependency by moving the SAGE domestic violence first phase 10-week course location to the Mother's church.  The Department referred the Mother to complete individual victims counseling as recommended by SAGE to help process her own sexual abuse trauma and address her

---

[7] That necessity ruling is unchallenged.

10

needs as the parent of a sexual abuse victim. The counseling aimed to help the Mother work toward being able to protect the children in her home, including L.P. The service could help a parent in denial if they were willing to participate in the therapy. Being fully invested in the program is extremely important or progress will not happen.

The Mother failed to appear for this second phase of individual sexual violence counseling for parents of abused children despite it being ordered by the trial court.[8] She failed to attend because she was unwilling. The Mother told SAGE employee Jessica Johnson that "she wasn't interested" in therapy. RP (Oct. 29, 2020) at 747. Ms. Johnson repeatedly followed up with phone calls, but after one additional phone conversation, the Mother did not respond.

Except for the domestic violence/sexual victim's individual therapy, and signing releases for her mental health counselor, Sommer Seitz, the Mother completed all of her court-ordered services. The Mother completed the parenting course, but the Department did not request a parenting assessment because there were no concerns about L.P.'s attachment to her.

Starting in March 2020, the Mother was granted unsupervised visitation with L.P. in her home conditioned on the exclusion of the Father, C.P., and B.P. No safety issues

---

[8] The Mother does not challenge this finding of fact despite challenging finding 2.14.29 which is almost the same.

occurred during the unsupervised visits. Nothing indicated a violation of the visitation

order by the Mother. However, the Mother indicated that she continued to allow the

Father into her home during the days when L.P. was not there. She intends to stay married

to him. Nothing will change her mind that the abuse did not happen. She has no intention

of leaving her husband or restricting his or C.P.'s access to the home in order to have L.P.

placed in her care.[9] She remains in regular contact with her adult sons, and because the

Mother intended to allow the Father and older brothers to have unrestricted access to L.P.

if he was returned, the Department maintained the position that the Mother could not

safely care for L.P. in the long term even though she was granted unsupervised visits.

The Mother had a psychological evaluation by Dr. Amy Ford in February 2018.

She refused to believe the abuse occurred, asserting instead that her daughters were

fabricating the allegations. Dr. Ford concluded that the Mother largely denied the

allegations against her husband for fear of losing her relationship with her husband. Dr.

Ford opined that the Mother is alienating her children with her dependency choices. Her

refusal to acknowledge the abuse renders counseling futile. Dr. Ford concluded that the

Mother would not be able to "safely parent" L.P. Dr. Ford suggested job training to

facilitate her separation from the Father and allow her to keep L.P. The Mother declined

job training because she believed "there was no reason to do so." CP at 187. The Mother

---

[9] This finding of fact resembles challenged findings 2.14.94 and 2.14.95.

testified that her physical conditions prevent her from working.  She has no other source of income and is trying to get on disability.

As of February 2020, the Mother was still noncompliant with SAGE domestic violence counseling for parents.  In April 2020, she moved for the return of L.P. to her home, but the motion was denied because she continued to deny the sexual abuse and "appears to continue to allow [the Father and C.P. and B.P.] access to the home, and has stated her intentions to remain with [the Father]."  Ex. 14 at 2.  The Mother again moved for return of L.P. in August 2020, and was denied for the same reasons.

TRIAL

In August 2020, the court accepted the termination of the Father's rights to R.P.  In September, the court accepted the termination of the Mother's rights to R.P.  The trial for termination of parental rights to L.P. began on October 23 2020, and lasted multiple days.  Several witnesses testified, including both parents, both daughters, the son, N.P., law enforcement, Department employees, numerous experts, and character witnesses.  C.P. and B.P. did not testify.

At trial, A.P. testified in detail regarding the regular sexual abuse she suffered at the hands of the Father and her brother, during her childhood.  A.P. also testified that when she was 16 years old, she found her father's camera placed in her shower.  The trial

13

court found A.P.'s testimony that her brother, C.P., began abusing her after he saw his father abuse A.P. credible.[10]

A.P. testified that she confronted the Mother and C.P. about the sexual abuse in 2015 after she turned 18. The Mother refused to believe her. The court found A.P.'s testimony compelling and credible. The court found that A.P. was sexually abused by the Father generally twice per week from 8 to 10 years of age and approximately once per month thereafter. The court found that A.P. was sexually abused by her brother C.P. from approximately age 12 to age 15.

R.P. also testified credibly at trial regarding her sexual abuse at the hands of the Father and her brother, B.P. The court found that the Father sexually abused R.P. sometime between the ages of five and seven, at times with the Mother in the same room. Based on testimony that B.P. raped R.P. on multiple occasions, the court also found that B.P. sexually abused R.P.

---

[10] A.P. testified, and the trial court found, that her brother, C.P. was abusing her after "[h]e saw my dad abusing me and then kind of used it as leverage over me." RP (Oct. 23, 2020) at 146. The dissent claims that A.P.'s statement is hearsay, but A.P. did not testify regarding the source of her knowledge that C.P. saw his father abusing her. Regardless, no objection was raised and A.P.'s testimony was admitted and considered by the court. The parents do not challenge this evidence or the trial court's finding. The dissent's sua sponte assertion that the testimony amounted to inadmissible hearsay and should not be considered as substantive evidence when the burden of proof is clear, cogent, and convincing has no support in the law. Even when the burden is beyond a reasonable doubt, unchallenged hearsay evidence may be considered as substantive evidence. *State v. Whisler*, 61 Wn. App. 126, 139, 810 P.2d 540 (1991).

The Father also testified. He denied molesting any of his children but acknowledged two incidents of inappropriate touching, but claimed that A.P. was the instigator and he scolded her. The Father testified that he believes an uncle molested his children and that R.P. made up the allegations because she was mad about moving. The court found the Father's testimony inconsistent and not credible.

The court found "overwhelming evidence" that the Father sexually abused his children, and that he was not amenable to treatment due to his unwillingness to acknowledge the sexual abuse of his children. Finally, the court found that L.P.'s "young age makes him more vulnerable compared to a child into their teens and is mindful of the ages [A.P.] and [R.P.] were when they were abused." CP at 161. "The evidence establishes that the [F]ather presents a present risk of harm to all children in his care, including [L.P.], and is thus currently unfit to parent." CP at 161.

The Mother heard all of her daughters' testimony regarding their sexual abuse by the Father. During her testimony, the Mother continued to deny the abuse and any prior knowledge of the abuse.[11] The court did not find her credible. The court found that nothing would change the Mother's denial regarding the sexual abuse of her daughters.

---

[11] These unchallenged findings are very similar to challenged finding of fact 2.14.94.

15

The court found that the "near future" for L.P. was four months. RP (Nov. 13, 2020) at 1084.

Other findings include that the parents failed to substantially improve their parental deficiencies within 12 months following entry of the dependency disposition order, and there was little likelihood that conditions would be remedied so that the child could be returned to either parent in the near future. In addition, the court found:

> [t]he evidence is such that based on the father's steadfast unwillingness to acknowledge and take responsibility for the abuse in the home and mother's inability or unwillingness to acknowledge the abuse that occurred in the home it is unlikely that either of them will make changes necessary to become fit in this child's near or foreseeable future or even for months beyond.

CP at 11 (FF 2.14.104).

The court also found that the Mother "has proven she is unwilling to protect her children even when faced with the possibility of losing her parental rights." CP at 190 (FF 2.14.103). The Mother was made aware of the sexual abuse allegations against her husband and C.P. in 2015, and "nothing happened" to protect her daughter because she refused to believe her. RP (Oct. 23, 2020) at 162. The court found that the mother was unwilling to acknowledge the abuse and take corrective steps to ensure L.P.'s safety. It found that the Mother had not demonstrated the ability and/or willingness to put her children's needs, including [L.P.]'s, above her own or that of her husband.

Finally, the court found that the continuation of the parent-child relationship diminished L.P.'s prospects for early integration into a stable, permanent home because he had been in foster care for three years, nearly one-third of his life. The foster family was willing to adopt L.P., and he would remain with his sister, R.P. The only impediment to adoption was the termination of parental rights. The bond between L.P. and his parents was undisputed, but the relationship prevented his full integration into a permanent home.

The trial court issued a letter decision in February 2021. In April, the court entered an order terminating the parental rights of the Father and the Mother. Both parents timely appealed in separate filings. Their cases have been consolidated for review.

ANALYSIS

STANDARD OF REVIEW

The parents challenge a long list of factual findings that support the trial court's conclusions that the Mother received notice of the deficiency that resulted in the termination of her rights, that they are unfit parents, and that termination was in L.P.'s best interest. While challenging some findings, they neglect to challenge a variety of corresponding findings that contain nearly identical information. Therefore, the challenges will be addressed as argued rather than as itemized numerically by the parties. Any numerically listed assignments of error that were not argued in the briefing can be

deemed abandoned. *Valley View Indus. Park v. City of Redmond*, 107 Wn.2d 621, 630, 733 P.2d 182 (1987).

Generally, the parents deny that any abuse occurred in the family home. They argue that L.P. is not in any danger. They claim to have completed all ordered and necessary services. The parents contend that the services that they did not complete were unnecessary. The Mother individually challenges that she received notice of the parental deficiencies that resulted in the termination of her parental rights and the finding that further services would have been futile. She claims that services should have been tailored to her physical disability because it was a deficiency.

In addition to the challenges raised by the Mother and the Father, the dissent contends that the evidence is insufficient to support the trial court's finding that the Father was unfit to parent his minor son, L.P. We disagree with the dissent for several reasons. First, the Father did not preserve, raise, or brief the argument raised by the dissent. Second, the dissent can only reach its conclusion by ignoring unchallenged evidence and challenging the credibility of expert testimony. This approach is contrary to our limited role. As an appellate court, we do not determine credibility but rather defer to the trial court's assessment of the persuasiveness of evidence. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Our role is limited to determining whether substantial evidence supports the trial court's findings of fact by clear, cogent,

and convincing evidence. *Id*. "Because of the highly fact-specific nature of termination proceedings, deference to the trial court is 'particularly important.'" *Id*. (quoting *In re Welfare of Hall*, 99 Wn.2d 842, 849, 664 P.2d 1245 (1983)).

"The trial court's findings of fact in a termination proceeding will not be disturbed so long as they are supported by substantial evidence in the record." *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313, 376 P.3d 350 (2016). "Substantial evidence is evidence in sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise." *In re the Welfare of T.B.*, 150 Wn. App. 599, 607, 209 P.3d 497 (2009). Whether findings of fact are supported by substantial evidence is determined in light of the degree of proof required by the legal conclusion at issue. *In re Dependency of P.D.*, 58 Wn. App. 18, 25, 792 P.2d 159 (1990). Reviewing courts defer to the trial court's determinations on the weight of the evidence, witness credibility, and conflicting testimony. *In re Welfare of A.W.*, 182 Wn.2d 689, 711, 344 P.3d 1186 (2015). Unchallenged findings are verities on appeal. *Id*. Whether findings of fact support the conclusions of law is reviewed de novo. *K.M.M.*, 186 Wn.2d at 477. Challenged findings are addressed specifically in each of the relevant legal issues below.

NOTICE OF PARENTAL DEFICIENCIES

The Mother contends that her due process right to adequate notice was violated. She claims that the trial court terminated her parental rights in part on two new grounds

19

not alleged in the petition. First, she argues that the trial court used her limited physical mobility as uncharged grounds for termination. Second, she claims that the Department relied on uncharged allegations that the Father abused their son, C.P., and the trial court made several findings on these allegations. Br. of Appellant (mother) at 19. The court's findings do not support the Mother's claim.

"In the context of a dependency proceeding, due process requires that parents have notice, an opportunity to be heard and defend, and the right to assistance of counsel." *In re Dependency of W.W.S.*, 14 Wn. App. 2d 342, 353-54, 469 P.3d 1190 (2020) (citing *In re Dependency of H.W.*, 70 Wn. App. 552, 555-56, 854 P.2d 1100 (1993)). Alleged deprivations of due process are reviewed de novo. *Id*. at 353 (citing *In re Welfare of A.G.*, 160 Wn. App. 841, 844, 248 P.3d 611 (2011)). "Due process is violated if a parent is held accountable for a parenting deficiency about which she was never notified." *In re Welfare of F.M.O.*, 194 Wn. App. 226, 230, 374 P.3d 273 (2016). Determination of whether a parent received adequate notice of an alleged deficiency is not limited to the termination petition; the entire dependency record is examined. *Id*. at 231.

During closing argument, the Department primarily argued that the Mother was unable to keep L.P. safe because she continued to disbelieve the abuse. However, as a final comment, the Department asserted that the Mother's physical condition also reduced her ability to keep her son safe. The Mother objected to this argument. In its rebuttal

20

closing, the Department retracted its argument regarding the Mother's mobility stating that it was merely a fact of the case and not a parental deficiency.

In finding that the Mother lacks the ability or willingness to protect any child in her care, the court noted that the Mother "insisted that she knew everything that went on in her home, even though it was established that she was confined to her 'chair' for extended periods of time due to her health conditions." CP at 189 (FF 2.14.99). This is not a finding that the Mother's disability was a parental deficiency. Instead, the court noted the Mother's limited mobility discredited her assertion that she always knew what was happening in the home.

The court went on to find that while physical mobility impacts the mother's ability to keep L.P. safe, "the court's [fitness] decision does not rest on her lack of mobility. The court would find mother unfit under the evidence even if she did not have her medical conditions which impact her mobility." CP at 190 (FF 2.14.101). Again, the court specifically found that the Mother's disability was not a factor. Since the court did not rely on the disability in finding the Mother unfit, the Mother's challenge is without merit.

The Mother also argues that the Department improperly relied on uncharged allegations that the Father had abused their now-adult son, C.P., and the court made several findings based on this uncharged allegation. Br. of Appellant (mother) at 19. This argument mischaracterizes the court's findings. The court made findings regarding

21

the circumstances surrounding the allegation that C.P. had been abused. (FF 2.14.12; 2.14.33; 2.14.40). Nevertheless, the Mother contends that the court relied on the allegation that the Father abused C.P. to find that the Father presents a safety risk to all children in his care. (FF 2.14.96; 2.14.103). Again, this argument is not supported by the plain language of the court's findings. The court did not make findings on whether the Father had abused C.P., nor did the court rely on this allegation to find the parents unfit.

> The termination petition filed by the Department included allegations that:

> Both parents are unfit to parent [R.P.] and [L.P.] because neither will validate the allegations regarding sexual abuse by the father, and no child can be safe in the parent's care without an acknowledgment that this abuse occurred. For these reasons, neither parent understands and is incapable of providing for his/her child's emotional, physical, mental, and developmental needs. Each parent is incapable of safely parenting the child, and is currently unfit.

CP at 5. The language of the termination petition provides sufficient evidence supporting the trial court's finding that the Mother was provided notice of the parental deficiencies relied on to render her unfit. The trial court relied exclusively on the stated deficiency and cited facts supported by the record in finding the Mother unfit. No other deficiency which could lead to termination of parental rights was attributed to the Mother during the dependency proceedings.[12]

---

[12] A copy of the dependency petition was not included as part of the record on review.

STATUTORY FACTORS AND FINDINGS OF UNFITNESS

Both parents contend that there was insufficient evidence to support the trial

court's finding that the parents were offered all necessary services to remedy their

deficiencies and that they are unfit to parent. We disagree. "Parents have a fundamental

liberty interest in the custody and care of their children" subject to statutory limitations

that balance the parent's rights with the child's needs and right to a safe and healthy

environment. *In re Dependency of K.D.S.*, 176 Wn.2d 644, 652, 294 P.3d 695 (2013)

(citing *In re Dependency of K.N.J.*, 171 Wn.2d 568, 574, 257 P.3d 522 (2011); *In re

Welfare of A.B.*, 168 Wn.2d 908, 919, 232 P.3d 1104 (2010)). Where the parent's

interests conflict with the child's right to basic nurturing, physical health, mental health

and safety, the child's rights prevail. RCW 13.34.020. "Whether a termination order

satisfies statutory requirements is a question of law" reviewed de novo. *K.N.J.*, 171

Wn.2d at 574.

In light of these significant rights, there is a two-step framework that the

Department must prove when seeking to terminate parental rights. First, the Department

must establish each of the statutory factors of RCW 13.34.180(1) by clear, cogent, and

convincing evidence. *K.M.M.*, 186 Wn.2d at 478. In addition to finding that the

Department has proved the statutory factors, the court must also find that the parent is

unfit. *Id*. at 479. "Satisfying all six of the statutory elements raises an implied finding of

parental unfitness." *Id.* If this burden is met, the Department must also prove, by a preponderance of evidence, that termination is in the child's best interest. RCW 13.34.190(1)(b); A.B., 168 Wn.2d at 911.

In this case, the only statutory element challenged by the parents is RCW 13.34.180(1)(d), which provides:

> That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided.

The Father claims that the Department should have provided him empathy counseling as a necessary service. The Mother claims that the Department failed to tailor necessary services to accommodate her physical disability and argues that the Department should have provided a home assessment and vocational rehabilitation services. Neither parent establishes how the services that they now claim are necessary would address the sexual abuse deficiency.

"A service is 'necessary' if it is needed to address a condition that precludes reunification of the parent and child." *In re Parental Rights to I.M.-M.*, 196 Wn. App. 914, 921, 385 P.3d 268 (2016) (citing *In re Welfare of C.S.*, 168 Wn.2d 51, 56 n.3, 225 P.3d 953 (2010)). The Department is required to identify a parent's specific needs and tailor the services it offers to meet each individual parent's specific needs. *In re Parental*

*Rights of D.H.*, 195 Wn.2d 710, 727, 464 P.3d 215 (2020) (citing *I.M.-M.*, 196 Wn. App. at 924); *see also In re Termination of S.J.*, 162 Wn. App. 873, 881, 256 P.3d 470 (2011) (citing *In re Dependency of T.R.*, 108 Wn. App. 149, 161, 29 P.3d 1275 (2001)). "[E]ven when the underlying cause of a parental deficiency cannot be remedied, the [trial] court must determine whether services were offered to remedy the resulting parenting deficiencies and whether . . . the deficienc[y] can be remedied in the future." *In re Welfare of A.B.*, 181 Wn. App. 45, 65-66, 323 P.3d 1062 (2014).

A parent's persistent refusal to participate in a service may satisfy the Department's obligation under RCW 13.34.180(1)(d). *In re Welfare of M.R.H.*, 145 Wn. App. 10, 26, 188 P.3d 510 (2008). The Department has offered all reasonable services where the record establishes that the offer of further services would be futile. *K.M.M.*, 186 Wn.2d at 483. The provision of services is futile when a parent is unwilling or unable to benefit from an offered and reasonably available service within a foreseeable time. *Id.* The definition of foreseeable future depends in part on the age of the child in each case. "A matter of months for young children is not within the foreseeable future to determine if there is sufficient time for a parent to remedy his or her parental deficiency." *M.R.H.*, 145 Wn. App. at 28 (citing *In re Welfare of Hall*, 99 Wn.2d 842, 844, 850-51, 664 P.2d 1245 (1983)) ("eight months not in foreseeable future of four-year-old").

25

The Department need not offer a service from which a parent is unable to benefit. *S.J.*, 162 Wn. App. at 881. Additionally, the statute does not preclude termination if a single beneficial service referral is unsuccessful and other services were provided, and there is little likelihood that conditions will be remedied. *In re Welfare of H.S.*, 94 Wn. App. 511, 521-22, 973 P.2d 474 (1999) (affirms termination of rights where parents suffering chronic mental illness received all necessary and available services).

Here the parental deficiencies are sexual abuse and failure to protect the children from sexual abuse. Neither parent argues that they are cognitively impaired. Both parents understood the services required of them.

*The Mother*

The Department offered the necessary court-ordered service of SAGE counseling to address the Mother's mindset and the needs of her children as victims. The Mother asserts that the services offered were unnecessary, that the service providers did not make accommodations for her physical disabilities, and that additional services should have been offered. We disagree.

The trial court's finding, that "all necessary services reasonably available, capable of correcting the parental deficiencies within the foreseeable future, have been expressly and understandably offered or provided," is supported by substantial evidence. CP at 173 (FF 2.13). The services provided to the Mother included "parenting education, mental

health counseling, psychological evaluation with parenting component, sign releases for the department, and individual domestic/sexual violence counseling through SAGE. The mother was also court ordered to keep in contact with the social worker and sign releases." CP at 173 (FF 2.13.1). The Mother participated in most of these services but was unwilling to attend and therefore did not complete individual domestic/sexual violence counseling at SAGE despite being court-ordered.

The Mother contends that additional services should have been provided. Specifically, she argues that had the Department assessed her physical disabilities, it would have ordered a home assessment and provided the Mother with referrals for vocational rehabilitation to help her navigate her home.

The Department service provider, SAGE, accommodated the Mother's mobility needs during the dependency by moving the SAGE domestic violence first phase 10-week course location to the Mother's church. Nothing indicates that they would not have continued to accommodate her if she had agreed to their individual counseling. The Mother's mobility issues did not impact her participation in services.

In support of her position, she cites *I.M.-M.*, where we reversed an order of termination after concluding that the evidence did not support the finding that all necessary services were offered. 196 Wn. App. at 921-22. The mother in *I.M.-M.* was known to have cognitive impairments and chemical dependency needs necessitating

integrated services. Despite these circumstances, the mother was not offered integrated services. Additionally, we noted that the service providers failed to accommodate the mother's special needs because there was no evidence that the service providers had been trained to work with cognitively disabled persons. *Id*. at 922.

*I.M.-M.* is factually distinguishable. The Mother's evaluation here indicated that she did not have a mental illness or cognitive deficiencies that would affect her ability to understand the counseling offered. As we noted above, the Department did not allege, and the court did not find, that the Mother's physical limitation was a deficiency. Therefore, services related to her limited physical abilities would not be necessary. The Mother's noted deficiency was her failure to protect her children from the Father. The Mother refused to complete the court-ordered individualized second phase SAGE domestic violence services targeted at addressing the needs of child victims. The Mother's unwillingness was the sole reason she failed to attend. Despite repeated efforts by SAGE, the Mother would not respond because she did not believe that she needed additional counseling.

The Mother assigns error to the court's finding that she was unwilling to participate in domestic violence victim counseling. She contends this treatment was unnecessary because the court also found no domestic violence between herself and the Father. Her argument fails to acknowledge that the court found these services

28

> could help [the Mother] address her own sexual abuse trauma; and address
> the needs of an individual who is a parent of a sexual abuse victim. The
> department referred the mother to this service with the hopes that if the
> mother could come to terms with her own past sexual abuse victimization
> so that she could then work towards being able to protect the children in
> her home, including [L.P].

CP at 178 (FF 2.14.22).

Finally, the Mother assigns error to the trial court's finding that she is unfit to

parent L.P. To establish current unfitness in a termination proceeding, the Department

must prove by clear, cogent, and convincing evidence that the parental deficiencies

"prevent the parent from providing the child with 'basic nurture, health, or safety.'" *A.B.*,

181 Wn. App. at 61 (quoting RCW 13.34.020). In the finding of fact challenged by the

Mother the court found that

> [the Mother] is also currently unfit as she has proven she is unwilling to
> protect her children even when faced with the possibility of losing her
> parental rights. [the Mother] was made aware of sexual abuse allegations
> against her husband years before the dependency action was filed and took
> no action to protect her children. [The Mother] continues to be unwilling to
> acknowledge the abuse and take corrective steps to ensure [L.P.]'s safety.

CP at 190-91 (FF 2.14.103). The Mother contends that it is not enough to prove a

deficiency. Instead, the Department must prove that she is unfit to parent a particular

child. She goes on to argue that the deficiency alleged that she failed to protect her

daughters from the Father's abuse, but there is no evidence that her son, L.P., was in

danger or that she had failed to protect him.

29

There is substantial evidence in the record that the Mother was unfit to parent L.P. Neither parent assigns error to the trial court's finding that there was "overwhelming evidence" that the Father abused his children. CP at 189 (FF 2.14.96). The court also found that the Father began abusing R.P. when she was between the ages of 5 to 7 years old and would do so while the Mother was in the room. Nor do the parents challenge the trial court's finding that the older son, C.P., began abusing his sister, A.P., after watching his father abusing her. Finally, the Mother does not assign error to the court's finding that based on

> the mother's stated opinion that the father is not a threat, her intentions to remain with the father, and her inability and or unwillingness to [put L.P.]'s needs above her and/or her husbands, [the Mother] would not be capable of protecting [L.P.] for sustained periods of time longer than that afforded during unsupervised visits as testified to by [the] social worker.

CP at 190 (FF 2.14.100).

Dr. Ford testified that if the Mother continued to deny that the sexual abuse occurred, the risk of further neglect, should the children be returned to her care, was high. After assessing the Mother, Dr. Ford was of the opinion that the Mother could not safely parent L.P. because she continued to deny the allegations of abuse.

The evidence supports the trial court's finding that all necessary services were offered to the Mother, and she was unwilling to complete these services because she refused to accept that her sons and the Father sexually abused her daughters. The

30

evidence also supports the trial court's finding that the Mother was unfit to parent L.P. because she would not protect him from the Father.

*The Father*

The Father claims that the Department should have provided him empathy counseling as a necessary service. This service was not ordered, and nothing in the record indicates that empathy counseling would address or resolve the Father's deficiency of sexual abuse or impact his relationship with his daughters, particularly where the relationship with R.P. was abandoned. Lack of empathy by itself was not identified as a parental deficiency. Even if victim empathy counseling was immediately effective in overcoming the Father's self-interest in avoiding criminal prosecution and led to his admission of abuse and participation in sexual deviancy treatment, such treatment is unlikely to be completed in L.P.'s near future. The Father did not complete court-ordered services or change his mind during the three-year dependency. He continues to deny the abuse even now on appeal. Empathy counseling is not a necessary service.

The Father also assigns error to the trial court's finding that he was unfit but does not otherwise provide argument on this assignment, so we decline to review it. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

Despite the lack of argument by the Father, the dissent maintains that the evidence is insufficient to support a finding that the Father is unfit. The dissent reaches this

31

conclusion after rejecting unchallenged evidence and findings of fact. The out-of-state cases cited by the dissent are not persuasive because they reach various results after interpreting out-of-state statutes.

Contrary to the dissent's conclusion, the evidence admitted at trial is sufficient to support the trial court's finding that the Father is unfit. The Department's evidence was sufficient to prove each of the six statutory factors of RCW 13.34.180(1) by clear, cogent, and convincing evidence. *K.M.M.*, 186 Wn.2d at 490 ("if all of the requirements of RCW 13.34.180(1) have been met, there is an implied finding of parental unfitness."). The Father was diagnosed with unspecified paraphilic disorder with a poor prognosis. Several experts testified that his untreated diagnosis created risks for any child in contact with the Father. Dr. Lontz testified that the Father's willingness to commit egregious violent acts toward one vulnerable individual increases the risk that he will victimize other vulnerable individuals. The court found this unchallenged evidence persuasive and concluded that that Father is a threat to any child placed in his care and unfit to parent L.P.

Both parents proved unwilling to take advantage of Department-referred services, the Department is not required to provide additional services with no connection or ability to resolve the parental deficiencies. The trial court's unchallenged findings of fact and sufficient evidence in the record support the conclusion that the parents' attitudes rendered all services futile. The services that they request for the first time on appeal

would not change the attitudes that prevented resolution of the parental deficiencies and reunification.

Sufficient evidence supports the findings that the Department provided all court-ordered and necessary services to resolve the parental deficiencies and that even if all services were not provided, the denials of abuse rendered all other services futile to resolve the parental deficiencies within four months. For that reason, both parents are unfit.

WHETHER SUFFICIENT EVIDENCE ESTABLISHES THAT TERMINATION OF THE PARENT-CHILD RELATIONSHIP IS IN L.P.'S BEST INTEREST

Both parents challenge the sufficiency of evidence to support the trial court's finding that terminating their parental rights is in L.P.'s best interest. They point out that they have a strong bond with L.P. and there is no evidence that the Father abused L.P. The trial court considered all relevant evidence and found that termination of parental rights was in L.P.'s best interest.[13] The finding is supported by substantial evidence.

The parents assert on appeal that a return of L.P. to their custody is in his best interest because L.P has not been personally sexually assaulted and that they share a

---

[13] The court considered "the length of time [L.P.] has been in care, his age, both of the parent's steadfast and unwavering denial of the abuse that occurred in the home, the risk to [L.P.] posed by his father, his mother's inability and or unwillingness to protect him, the unlikelihood of any change and [L.P.]'s need for permanency." CP at 193 (FF 2.17.5).

loving parental bond. As many prior decisions have stated, "love is not enough" when safety is the consideration. *In re Dependency of A.D.*, 193 Wn. App. 445, 459, 376 P.3d 1140 (2016).

A parent's past history is a factor that may be weighed in evaluating the current risk to a child. *In re Dependency of Brown*, 149 Wn.2d 836, 841-42, 72 P.3d 757 (2003). The court is not required to wait for a younger sibling to become directly damaged by the same conditions that already damaged older siblings. *In re Dependency of P.D.*, 58 Wn. App. 18, 28, 792 P.2d 159 (1990) (citing *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979)); *see also In re Dependency of A.S.*, noted at 100 Wn. App. 1038 (2000). L.P.'s safety if returned to his parents has not been demonstrated, and the parents could not resolve their deficiencies within four months of trial. Termination of parental rights is in L.P.'s best interest to secure permanency after three years in a safe, stable environment with his sister. His foster parent is willing to adopt him and provide permanency and stability. Termination of parental rights is the only impediment to adoption.

After the Department satisfies the burden of all six elements discussed above, it must finally establish that the termination is in the child's best interests by a preponderance of the evidence. RCW 13.34.190(1)(b) and (2); *In re Welfare of A.J.R.*, 78 Wn. App. 222, 228, 896 P.2d 1298 (1995); *A.B.*, 168 Wn.2d at 911; *M.R.H.*, 145 Wn.

App. at 24. "The preponderance of the evidence standard is satisfied when the findings

of fact are supported by 'substantial evidence,' which is evidence in sufficient quantum to

persuade a fair-minded person of the truth of the declared premise." *In re Dependency of*

*J.D.P.*, 17 Wn. App. 2d 744, 755, 487 P.3d 960 (2021) (citing *Ridgeview Props. v.*

*Starbuck*, 96 Wn.2d 716, 719, 638 P.3d 1231, 638 P.2d 1231 (1982)).

Termination of parental rights is in a child's best interest when a parent fails to

rehabilitate deficiencies over a lengthy period of time, leaving a child in foster placement

limbo. *In re Dependency of A.W.*, 53 Wn. App. 22, 33, 765 P.2d 307 (1988). There are

no set criteria for making this determination as each case largely depends on its own

unique facts and circumstances. *J.D.P.*, 17 Wn. App. 2d at 755; *In re Welfare of*

*Aschauer*, 93 Wn.2d 689, 695, 611 P.2d 1245 (1980). The trial court may review and

investigate the entire record of parenthood and specifically may consider a parent's

failure to rehabilitate after an adequate time. *In re Welfare of Ross*, 45 Wn.2d 654, 657,

277 P.2d 335 (1954); *In re Welfare of Russell*, 70 Wn.2d 451, 423 P.2d 640 (1967). A

juvenile court "'has broad discretion in dependency and termination proceedings to

receive and evaluate evidence in light of a child's best interest.'" *In re Welfare of X.T.*,

174 Wn. App. 733, 738, 300 P.3d 824 (2013) (quoting *In re Interest of J.F.*, 109 Wn.

App. 718, 728, 37 P.3d 1227 (2001). Reviewing courts have a duty "to place '*very strong*

*reliance on trial court determinations of what course of action will be in the best interests*

of the child.'"  *In re Dependency of D.A.*, 124 Wn. App. 644, 658, 102 P.3d 847 (2004)

(quoting *In re the Interest of Pawling*, 101 Wn.2d 392, 401, 679 P.2d 916 (1984)).

In *K.M.M.*, attachment services were deemed futile when the child refused

visitation and could not tolerate her father despite his willingness.  No evidence

established that the relationship could be repaired.  186 Wn.2d at 483-84.  In that way,

*K.M.M.* is distinguishable from the present case where the parental bond remains strong.

L.P. has been dependent since he was seven years old; at the time of trial, he was

ten.  His foreseeable future established at trial was four months.  L.P. has been in his

foster home with his sister R.P. since 2019.  Neither child has any "special needs."  RP

(Oct. 29, 2020) at 848.  L.P. has "blossomed" while in the foster home.  *Id.* at 776.  The

foster home is safe, stable, and appropriate.  L.P.'s foster parent wishes to adopt him.

Even though the Father and the Mother both claim in their appellate briefing that L.P.

wants to come home, they do not challenge the finding that L.P. has told his CASA (court

appointed special advocate) that "he did not want to go home."  CP at 192.  The record

indicates that L.P.'s desire to return home wavered back and forth.  L.P.'s bond with his

parents, however, is not an issue.  He is bonded with his parents.  Nonetheless, the social

worker, CASA, and Dr. Lontz all recommended that it would be in L.P.'s best interest to

terminate the parents' rights.

The primary issue preventing family reunification here is the sexual abuse of children in the home. The parents claim that there is no problem with L.P. because there is no finding that he was sexually abused. They do not acknowledge the impact of secondary trauma on L.P. from exposure to the abuse of his sisters or the potential for L.P. to become an abuser like his brothers. They seem to imply that without the daughters in the home, the problem is gone. Such assertion reflects their ongoing deficiency. If returned, L.P. will continue to suffer the impact and influence of his father and brothers' sexually deviant behavior on his own behavior. The risk remains that L.P. will be taught to abuse as his older brothers were taught. L.P. and the Father will continue to come into contact with other female children in other venues providing the opportunity for L.P. to act out in the same manner as his brothers and suffer the consequences.

The parents' arguments are unpersuasive regarding the elimination of the risk to L.P. The passage of time has not changed their attitude regarding the abuse. The Mother was resistant to treatment from SAGE that addressed how to understand her children as abuse victims. The Father's motivation for sexual deviancy treatment was determined to be substantially low. Ken Schafer opined that the Father was not amenable to treatment because of his denial of the sexual abuse. Without indicating a need for treatment for the Father, Mr. Bailey generally concurred that unwillingness to effectuate change indicates little likelihood of progression in treatment.

37

Sufficient evidence exists to support the conclusion that the Father's sexual deviancy has not and cannot be treated without acknowledgment of the abuse. Correspondingly, the expert testimony supports the conclusion that the Mother's denial of the abuse renders her unable to keep L.P. safe from psychological harm. It is not in L.P.'s best interest to return him to an unsafe home or drag out the dependency until he is too old to be adopted.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

I CONCUR:

_____
Pennell, J.

No. 38168-4-III cons. with No. 38169-2-III

*The purpose of terminating parental rights is not to punish the parent but to protect the children involved.*  In re the Termination of D.B., *942 N.E.2d 867, 872 (Ind. Ct. App. 2011).*

FEARING, J. (dissenting) — This appeal poses the somber question of whether to terminate a father's rights to his ten-year-old son and thereby deny the father and son the fundamental constitutional right to companionship in the context of the father's molestation of his daughters.  In addition to the father, the mother of the son appeals the termination of her parental rights, but any success for her appeal rests on a ruling as to the father's fitness.

The trial court terminated the parental rights of L.P.'s parents based on a finding that L.P.'s father was unfit to parent any child.  This dissent identifies the compounding factual and legal errors underlying this finding of fact.  First, this finding was irrelevant because the court must apply the legal standard of whether the parent is fit to parent the child at issue at the time of the termination trial, not whether in the abstract the father can parent any child at some unidentified time.  Second, the finding of fact fails to identify those facts on which the court draws the conclusion of unfitness.  Third, an examination of the underlying evidence, even in a light most favorable to the State, shows no required nexus between the father's abuse of the daughters and potential harm to L.P.  Any potential harm is speculative.  Even State experts did not testify to a probability of harm to L.P.

Fourth, the trial court relied on inadmissible hearsay when reaching the finding of unfitness. For example, the facts show that, in addition to the father raping the two daughters, one older brother raped one of his sisters and a second older brother raped the other sister. According to the State, the oldest son saw the father rape the oldest daughter and used the observation as leverage to rape his sister. The trial court entered a finding of fact confirming this allegation. But this finding lacks support in any percipient testimony. Fifth, in addition to relying on hearsay evidence, the trial court relied on expert testimony based on false assumptions and erroneous legal standards.

The undisputed facts show a loving relationship and strong bond between L.P. and his parents and establish that L.P. did not know of the abuse in the home. Termination of a child's relationship with natural parents, with whom he bonded during tender years, imposes severe psychological harm on the child. Because of grave damage to L.P. resulting from this termination, because the State did not establish, even when employing inadmissible hearsay and speculative opinions, unfitness of L.P.'s father to parent L.P., and because of the breach of the parents' and L.P.'s fundamental constitutional right to companionship, I dissent.

-------------

I garner the facts from the parental termination trial that proceeded in October and November 2020. I emphasize some facts already catalogued in the majority opinion, and I add other facts. While recounting the facts, I synchronously analyze the admissibility at

2

trial and employment in the superior court's decision of hearsay evidence. I demonstrate how hearsay evidence impermissibly infected the superior court's decision and continues to afflict this appeal. I address admissibility of evidence reluctantly because, even when employing the inadmissible evidence in the calculation of parental unfitness, the State's evidence falls short of the constitutional requirement of parental unfitness. I also address the use of hearsay evidence hesitantly because the majority seeks to exploit my analysis of this use by asserting the dissent does not analyze the facts in a light favorable to the winning party.

The father and mother begot seven children: twenty-nine-year-old son C.P., twenty-six-year-old male B.P., twenty-four-year-old daughter A.P., twenty-one-year-old son N.P., seventeen-year-old female R.P., and L.P., the ten-year-old son subject to this parental rights termination proceeding. The seventh and youngest child was born with a defect that tragically caused his death seven months later. At the time of trial, the parents and their third son, N.P., resided in Bothell.

The mother suffers from numerous health issues, which began at the birth of the oldest child C.P. The mother has been in car accidents. She has undergone three surgeries on her legs and needs a fourth. Bone scrapes against bone in her right ankle. The mother underwent hernia and gall bladder surgeries. She suffers from asthma and a blood disorder. She reposes most of the time in a living room chair, where she also sleeps because of pain resulting from lying on a bed.

Based on sufficient evidence, the superior court found that the father regularly sexually assaulted daughter A.P. while A.P. was between the ages of 8 and 14. The abuse did not occur with other siblings present. Oldest son C.P. sexually assaulted A.P. on more than one occasion when A.P. was between twelve and fifteen years old.

The father sexually abused the youngest daughter, R.P., while she was between the ages of five and seven. The second oldest son, B.P., then abused R.P. until her age of eleven.

A.P. testified, without objection from either parent's attorney, that C.P. told A.P. that he saw the father molest A.P. on one occasion. This testimony was hearsay, because A.P. testified to an out-of-court statement of C.P. offered for the truth of the matter asserted in the statement. ER 801, 802. C.P. never testified. Parents' attorneys may not have objected to the hearsay because the testimony was a nonresponsive answer to a question posed about the demeanor of C.P.

> Q So, as you're walking out the door you see him on the stairs and what did you observe about him, his demeanor, his face when you walked out that door?
> A Honestly, I was panicked once *he told me that he saw*.

Report of Proceedings (RP) at 146 (emphasis added). Still, counsel could have, but did not, move to strike A.P.'s answer as nonresponsive and as hearsay.

Footnote 10 of the majority opinion asserts that A.P. never testified to the source of her knowledge that C.P. saw the father abuse A.P. Thus, according to the majority,

4

A.P.'s testimony could not be hearsay. But A.P. never testified that she saw C.P. observe the father's abuse. To the contrary, the passage from A.P.'s testimony cited above confirms that A.P. learned of C.P.'s knowledge only because "he [C.P.] told me that he saw." Clerk's Papers (CP) at 146. On a scale of one to ten, this passage rates as a ten on the hearsay scale.

This inadmissible hearsay evidence permeates the case. The superior court found that C.P. "saw [the father] abusing [A.P.] and used it as leverage against her." CP at 185. No admissible evidence confirmed that any son observed the father molest a daughter, let alone that a son used the father's abuse as an opportunity to molest a sister.

Generally, the trial court may consider, as substantive evidence, hearsay to which the opposing party did not object. *Walling v. S. Birch & Sons Construction Co.*, 35 Wn.2d 435, 437, 213 P.2d 478 (1950); *In re Guardianship of Marshall*, 46 Wn. App. 339, 343, 731 P.2d 5 (1986). Under this rule, evidence admitted without objection may be considered by the trier of fact "for its probative value." *State ex rel. Partlow v. Law*, 39 Wn. App. 173, 177, 692 P.2d 863 (1984). Statedly differently, inadmissible evidence, when received without objection, has "probative value, depending upon its character." *Munday v. Department of Labor & Industries*, 35 Wn.2d 374, 377, 213 P.2d 481 (1949); *Harter v. King County*, 11 Wn.2d 583, 598, 119 P.2d 919 (1941). These two recitations of the rule suggest the trial court must be careful when considering the hearsay evidence.

I endorse two limits on the trial court's utilization of hearsay evidence, which limits case law supports. First, admitted hearsay should not be used in a proceeding, in which the proponent of the evidence faces a clear, cogent, and convincing evidentiary standard. Second, unobjected to hearsay should not count as substantive evidence when the State seeks to end a parent's fundamental rights. My proposed duo of limits arises from rulings in three Washington decisions and one United States Supreme Court decision.

Fathers and mothers should not be deprived of their parental rights based on hearsay, which is but another form of unsworn testimony. *In re Welfare of Ross*, 45 Wn.2d 654, 655-56, 277 P.2d 335 (1954); *In re Welfare of X.T.*, 174 Wn. App. 733, 738, 300 P.3d 824 (2013); *In re Welfare of J.M.*, 130 Wn. App. 912, 924-25, 125 P.3d 245 (2005). In *In re Welfare of Ross*, 45 Wn.2d 654 (1954), the Evergreen Supreme Court reversed an order terminating a father's rights to his child. The superior court had relied on allegations asserted in a divorce cross complaint by the father's wife, which wife did not testify in the parental rights termination proceeding. The Supreme Court ruled that the superior court committed error by "dignifying" the allegations in the findings of fact. 45 Wn.2d at 656.

In *In re Welfare of X.T.*, 174 Wn. App. 733 (2013), the father of X.T. challenged, on grounds of insufficiency of evidence, a superior court's order declaring X.T.

dependent. X.T.'s father emphasized the State's evidence relied on inadmissible hearsay. This court agreed and reversed the order of dependency.

The sole witness at X.T.'s dependency fact finding hearing was the State's social worker assigned to the case. The superior court overruled the objection of X.T.'s father to the witness testifying to her notes. The social worker presented some testimony based on her own knowledge and some based on a review of the department file. She opined that X.T. faced imminent risk and that the father was currently unfit.

On appeal, in *In re Welfare of X.T.*, this court noted a reviewing court must not reweigh witness credibility and must defer to the superior court's findings if substantial evidence supported the findings. This court impliedly recognized a lower standard to establish a dependency than to terminate parental rights. The father argued that, although the social worker could testify to hearsay found in State records, the evidence could not be used as proof of the assertions in the records. The hearsay could not be employed as substantive evidence. Nevertheless, the superior court did not limit consideration of the testimony to demonstrate how the social worker arrived at her opinions. Instead, the trial court adopted allegations contained in the reports as factual findings.

In *In re Welfare of J.M.*, 130 Wn. App. 912 (2005), this court noted the fundamental and constitutional rights at stake in a parental rights termination proceeding. The mother's lawyer stipulated to the admission of damaging written reports by nontestifying experts through the testifying social worker and guardian ad litem. One

expert report classified the mother as exhibiting an unspecified personality disorder with histrionic and narcissistic features that led to child neglect and failure to protect. According to the expert, the mother's prognosis was poor. The superior court incorporated the opinions of the expert in its findings and characterized the evidence in the report as clear, cogent, and convincing evidence that the mother could not parent. This court reversed the termination in part because the proceeding denied the mother due process and she suffered ineffective assistance of counsel when her trial attorney failed to object to the reports as hearsay.

In an obtuse and ignored decision, *Moore v. United States*, 429 U.S. 20, 97 S. Ct. 29, 50 L. Ed. 2d 25 (1976), the United States Supreme Court reversed a drug conviction based on hearsay that John David Moore had access to the room in which law enforcement found the controlled substance. The Court emphasized that such inadmissible evidence fails to prove the State's case beyond a reasonable doubt. The Court rejected the argument that the error was harmless because Moore was convicted after a bench trial rather than by a jury. The Supreme Court emphasized that the trial court expressly relied on the hearsay testimony in its ruling. I mention this criminal decision since the burden of proof in a criminal case, as in a parental termination proceeding, exceeds the normal preponderance of evidence standard.

In footnote 10, the majority opinion remarks that the trier of fact may consider hearsay testimony, to which a party never objects, even in a criminal case. I recognize

8

this rule on page 5 above. I am uncertain, however, as to whether the majority concludes that this court should uphold a conviction for a crime or a termination of parental rights based on hearsay that serves as critical evidence. If so, *State v. Whisler*, 61 Wn. App. 126, 139, 810 P.2d 540 (1991), cited by the majority opinion, does not stand for this proposition. *In re Welfare of J.M.*, 130 Wn. App. 912 (2005), rejects the use of hearsay evidence to terminate parental rights even when the parent stipulated to the evidence.

The amount of hearsay utilized by the trial courts in *In re Welfare of J.M.* and *In re Welfare of X.T.* exceeded the quantum of hearsay utilized by L.P.'s parents' trial court. The number of hearsay statements in L.P.'s parents' trial, however, paralleled the number of hearsay statements in *In re Welfare of Ross* and *Moore v. United States*. Regardless, hearsay important to the trial court's ruling should be shunned no matter its numerical value. C.P.'s alleged viewing of the father molesting R.P. looms prominent in the trial court's decision and this court's majority's affirmation of termination of parental rights.

The majority, in its extensive footnote 10, correctly observes that L.P.'s parents do not challenge the testimony of A.P. as to C.P.'s comment as inadmissible hearsay. Based on the lack of an assignment of error, the majority chooses to avoid the error. Nevertheless, this court could have and should have called for additional briefing from the parties as to the admissibility and prejudice of A.P. testifying to C.P.'s out of court statement of purportedly viewing C.P.'s abuse. RAP 12.1(b) authorizes this court to address an issue not raised in the parties' brief after notice and an opportunity for the

9

parties to be heard. *Dalton M, LLC v. North Cascade Trustee Services, Inc.*, 20 Wn. App. 2d 914, 942, 504 P.3d 834 (2022). Because of the constitutional right to parent and the harmful consequences to a child of terminating contact with parents, this court should carefully review all issues, even those not raised by the parties, before affirming a parental termination.

A discerning reader will ask why this dissent devotes pages to discussing inadmissible hearsay evidence when the dissent also concludes that insufficient evidence supports the finding of parental unfitness even when adding the hearsay evidence. I do so because a dissent should muster all reasons supporting an outcome different than ordered by the majority. The grave repercussions attendant to the appeal of a parental rights termination magnify this need for mustering. I also do so to show the cumulative unfairness meted on L.P. and his parents as a result of this termination proceeding.

I return to the facts in the case on appeal. The State also sought to introduce testimony from A.P. that C.P. told her that the father abused him, but the superior court correctly ruled the testimony inadmissible as hearsay. Similar to A.P.'s testimony that C.P. told her that he observed the father abuse A.P., this additional testimony relied on out-of-court purported comments of C.P., who never testified under oath. The court's exclusion of this evidence confirms the trial court would have excluded, if counsel had objected, A.P.'s testimony of C.P. purportedly telling her that he saw molestation.

10

Despite the trial court ruling the testimony of purported abuse of C.P., the oldest son, by the father to be inadmissible, the allegations of this misbehavior permeated the trial in addition to the son's purportedly viewing the father molest A.P. A.P. was allowed to testify that she forwarded to the sheriff and child protection services an allegation that the father abused C.P. without identifying, during trial, the source of her information. State employees testified to the allegations. The State repeatedly elicited testimony from experts about uncharged allegations that the father sexually abused C.P. when he was a child. State expert Ken Schafer faulted the father's expert Jason Bailey when Bailey testified that the father posed no risk to his son L.P. since Bailey failed to question the father about allegations of abuse of his oldest son.

Despite ruling evidence of abuse of the oldest son inadmissible, the superior court entered a finding that declared: "The allegations of abuse also included that [the father] sexually abused [C.P.], the eldest child." CP at 177. Another finding read: "Mr. Schafer was aware that there were allegations that [the father] had abused his oldest son as well." CP at 180. A third finding mentioned Schafer's critique of Jason Bailey for not questioning the father about allegations that he abused C.P. Despite couching this purported abuse as allegations, the allegations and inadmissible evidence must have been important to the superior court because of their repeated mention in the findings. Allegations should not form findings of fact. Allegations do not constitute facts, unless the court finds they occurred based on admissible evidence.

11

The father denies the sexual touching of any children. He denies knowledge of C.P. or B.P. sexually touching any of their sisters. C.P. and B.P. did not testify during the termination trial. I must and do accept the superior court's finding of fact that sexual assaults of the daughters occurred. I must and do exclude from consideration the allegations of possible sexual abuse by the father of any son. I also must and do exclude from consideration C.P. allegedly seeing molestation of A.P.

In a separate proceeding in Walla Walla County, the State of Washington charged the father with two counts of rape of a child in the first degree, one count of incest in the first degree, and one count of child molestation in the first degree. The State alleged the father assaulted his daughters, but not his sons. The State also charged C.P. and B.P., in a Walla Walla County prosecution, with sex crimes against their sisters. In February 2020, the three accused family members and the State entered a stipulated order of continuance, under which all charges would be dismissed if the respective family members faced no criminal charges during the following year. The father agreed to undergo counseling as part of the stipulation. The stipulation included no admission of guilt. By the time of the October 2020 parental rights termination trial, none of the accused had been charged with another crime. The record confirms a March 2021 dismissal of the charges, which occurred after the termination trial.

Robin Olson, the father's criminal defense attorney in Walla Walla, testified in the parental termination trial to her respective interviews of daughters, A.P. and R.P. The

12

prosecuting attorney and lead detective attended the interview of A.P. A.P. provided different stories at the parental termination trial than what she disclosed during the interview. During the interview, A.P. followed a statement she gave to the detective.

Criminal defense attorney Robin Olson interviewed R.P. in the prosecuting attorney's office with the prosecuting attorney and a social worker present. R.P. indicated she did not remember anything.

The third oldest son, N.P., testified, during the parental rights termination trial, that his parents took excellent care of him and his siblings. N.P.'s bedroom was in the basement, where the alleged abuse of the daughters occurred.

The State concedes the lack of any allegations or evidence of abuse of L.P. by the father. According to the guardian ad litem of L.P., L.P. is bonded with his parents. Both parents love L.P., and L.P. loves both of his parents. L.P. does not know why he no longer lives with his parents. L.P. misses his parents. Older brother N.P. and L.P. had maintained a close brotherly connection. L.P. expressed, to his guardian ad litem, a desire to return home to his parents.

According to social worker John Plotz, the mother maintains a good relationship with her son, L.P. She is allowed unsupervised visits in the home and has never violated restrictions on visitation. According to Plotz, L.P. will suffer a loss if the court terminates the parental rights of his parent. L.P. will suffer a further loss by losing his relationship with his older brother, N.P.

13

Since the 1940s, studies and literature have confirmed what others knew by intuition for centuries. Wresting a child from even inadequate parents causes detrimental, long-term, and complex emotional and psychological consequences worse than leaving the child at home. *In re Dependency of L.C.S.*, 200 Wn.2d 91, 106, 514 P.3d 644 (2022); Vivek Sankaran, Christopher Church & Monique Mitchell, *A Cure Worse Than the Disease? The Impact of Removal on Children and Their Families*, 102 MARQ. L. REV. 1161, 1165-71 (2019); Rebecca Bonagura, *Redefining the Baseline: Reasonable Efforts, Family Preservation, and Parenting Foster Children in New York*, 18 COLUM. J. GENDER & L 175, 196 (2008). The harm includes separation and attachment disorders, grief, and confusion due to separation from family. Shanta Trivedi, *The Harm of Child Removal*, 43 N.Y.U. REV. OF L. & SOCIAL CHANGE 523, 523, 526 (2019). Posttraumatic stress disorder in dependent children is twice as high as the rate for U.S. war veterans. Delilah Bruskas & Dale H. Tessin, *Adverse Childhood Experiences and Psychological Well-Being of Women Who Were in Foster Care as Children*, 17 PENN. J. 132 (2013). Too often the State and courts ignore the trauma imposed on a child by termination of parental rights. *Department of Human Services v. H.L.R.*, 244 Or. App. 651, 260 P.3d 787 (2011). Children possess a right to be free from unreasonable risks of harm flowing from State intervention. *Braam v. State*, 150 Wn.2d 689, 694, 81 P.3d 851 (2003).

14

--------------

I now review expert testimony presented at the parental rights termination trial. Much of the trial testimony focused on psychological profiles of the father, actuarial instruments employed to measure a sex offender's possibility of recidivism, and expert opinions as to the risk of the father sexually assaulting L.P.

Actuarial instruments are often used in sexually violent person trials to aid in the prediction of an offender's future dangerousness. *In re Detention of Thorell*, 149 Wn.2d 724, 753, 72 P.3d 708 (2003); *In re Detention of McGary*, 175 Wn. App. 328, 338, 306 P.3d 1005 (2013). The actuarial approach evaluates a limited set of predictors and then combines these variables using a predetermined, numerical weighting system to determine future risk of reoffense which may be adjusted or not by expert evaluators considering potentially important factors not included in the actuarial measure. *In re Detention of Thorell*, 149 Wn.2d 724, 753 (2003).

The most prominent test developed by statistical psychologists is the test labeled the static-99 assessment instrument. The fabricators of the test reviewed capacious data that listed the number of repeat offenses of those convicted of sexual assaults. Psychologists generally employ static-99 test results for purposes of State proceedings to house a released offender as a sexually violent person. I find no decision involving the use of the test for a parental rights termination case. But I see no reason to exclude the

15

testing in a termination trial when the superior court must determine the risk that a parent might engage in sexual deviancy against a child in the future.

Ken Schafer, a licensed mental health counselor and certified sex offender treatment provider, testified for the State. Schafer claimed that he can determine if a person poses a risk of sexual misbehavior. He does so after meeting with the client two to three times, reviewing a client's self-reporting questionnaire, performing psychological testing, and administering a polygraph examination.

The State referred L.P.'s father to Ken Schafer for an evaluation of sexual behavior and risk. The State informed Schafer that the father's two daughters alleged sexual abuse. Because he did not trust Schafer, the father refused to undergo a polygraph administered by Schafer and instead underwent two polygraphs performed by others. Schafer did not accept the validity of the polygraphs performed by others. He rejected the value of the polygraphs because of the absence of specific questions concerning the father's daughters.

During trial, Ken Schafer explained that standardized tests that score risk assessments, including the static-99 test, assume that the client sustained a criminal conviction. Schafer added that he did not address or categorize L.P.'s father as a risk because the father had not been convicted of any crime. Thus, despite having been asked to assess the risk of L.P.'s father repeating his criminal behavior, Schafer rendered no such opinion. To repeat, the father had not been convicted of any crime. Schafer

recommended, however, that the father not be left alone with any minor children because Schafer wanted to err on the side of caution.

Despite not predicting recidivism, Ken Schafer administered psychological testing on the father. The testing raised no concerns in Schafer that the father might abuse another child. The father's risk assessment questionnaire indicated no deviant or inappropriate sexual interest. Schafer recommended against any parenting classes since he found no demonstration of any parenting problem to address.

Ken Schafer testified that he never addressed potential sexual abuse by the father of the sons in the house. Nevertheless, he averred that his evaluation would differ if he only evaluated the father based on allegations raised by the daughters than if both daughters and sons claimed abuse. This latter remark may conflict with the earlier comment.

Jameeson Lontz, a psychologist who specializes in forensics and neuropsychology, testified on behalf of the State. Lontz performs forensic parental evaluations to assess whether a parent suffers from a mental illness and, if so, whether the illness interferes in a parent's ability to parent. He grounds his opinions on a clinical intake questioning that lasts ninety minutes, psychological testing that lasts four to six hours, and review of other reports and records.

The State asked Jameeson Lontz to perform an evaluation of the father. As part of the evaluation, Lontz interviewed the father. According to Lontz, the father suffers from

no psychological symptomology or psychosis. Nevertheless, Lontz diagnosed the father with a specific personality disorder with passive aggressive presentation and with paraphilic disorder. A paraphilic disorder means intense sexual fantasies, urges, or behaviors that involve activity with prepubescent children. Lontz opined that the father demonstrated a "rather moderate versus low or high, rather moderate probability of . . . reoffending." RP at 386. Nevertheless, Lontz described his opinions as "provisional" because the father's guilt had not yet been established. RP at 396. To repeat, the recidivism testing requires a conviction, and the father has not been convicted.

Jameeson Lontz did not differentiate between the ability to parent a boy or a girl. According to Lontz, the egregious act of violence toward one vulnerable person increases the chance of such an act with another person. He agreed, however, that he was not opining that the father will abuse again.

On occasion during his trial testimony, Jameeson Lontz commented that L.P.'s father had failed to demonstrate his parental competence. Lontz thereby reversed the burden of proof in a parental termination proceeding. As a result of this misperception of proof, Lontz insisted on a need to terminate the father's parental rights to L.P.

At the request of the father's counsel, forensic psychologist, Loren McCollum, performed an evaluation of the father's fitness to parent L.P. The evaluation included an initial two-hour interview, four to six hours of testing, and a later three-hour interview. McCollum also reviewed reports prepared by others about the father. The Minnesota

18

Multiphasic Inventory and Personality Testing Inventory (PAI) tests, common evaluators

for parenting, demonstrated no diagnosable condition in the father. McCollum's testing

also included a potential child abuse inventory, which established no risk.

Loren McCollum concluded that the father can parent L.P. When questioned

about the contrary opinion of Jameeson Lontz, McCollum noted that he recently

performed his testing on which he based his opinions, while Lontz performed his testing

two years earlier. Evaluations grow stale after one year. McCollum also commented that

Lontz did not conduct sufficient testing to reach an opinion as to the future.

In his report, Loren McCollum dismissed restricting the father's contact with L.P.

because the allegations of abuse against the father concerned daughters. A paraphilic

disorder typically targets a specific population, and the father's alleged primary target

population had been his daughters. He testified that no information or data suggested that

the father cannot parent L.P. or that L.P. is not safe in the family home.

At the request of the father's counsel, Jason Bailey, a licensed mental health

counselor and a certified sex offender treatment provider, evaluated the risk that the

father posed to L.P. In August and September 2020, Bailey performed what he labeled a

sexual abuse risk assessment, including two to five meetings with the client up to one and

one-half hours long each time, administering psychological testing, conducting a sexual

issue polygraph, interviewing collateral contacts, and reviewing records. He

administered the static-99 test, the PAI, a suppression inventory, the Beck anxiety

19

inventory, a pre-sexual attitude scale, the Bumby cognitive distortion scale, a hypersexual behavior inventory, an internet sex screening test, a pornography consumption inventory, and a sexual addiction screen test. Bailey reviewed police reports, the State file, the evaluation by Loren McCollom, and the report and risk assessment performed by Ken Shafer. When evaluating L.P.'s father, Bailey also interviewed the father's son, N.P.

The testing performed by Jason Bailey produced no significant findings as to the father's psychological makeup. The father maintained a reduced libido because of his age. The extensive testing established no paraphilia.

Jason Bailey testified that the father scored a negative one on the static-99 test inventory. The score assumed that the father had at least one conviction for a sex crime. To repeat again and again, the father garnered no conviction. The score of negative one translates into the father being a below average risk, not when compared to the general population, but when compared to the sex offender population. Out of 100 people convicted of a sexual motivated offense, with the same risk profile as the father and with the assumption of a conviction, 0.8 percent of the people would be expected to recidivate over a period of one year. 3.4 offenders would be expected to recidivate sexually over three years, and 5.3 would be expected to recidivate over five years. According to Bailey, no data outside the allegations of abuse forwarded against the father established the father as a risk to his son, L.P.

Jessica Johnson testified for the State. Johnson oversees the Wenatchee local crime victim's office. Johnson opined that, even if a child is not the direct victim of sexual abuse, knowledge that a parent abused a sibling places the child's emotional development at risk. The knowledge of abuse damages trust in a parent who performed the abuse and the other parent for not protecting the sibling. More importantly, Johnson averred that she can identify no risk to the child if the child does not know about the abuse by the parent of a sibling.

In summary, trial experts, when rendering opinions, falsely assumed allegations or inadmissible hearsay evidence that the father abused an older son. All expert predictions were based on the false predicate that the father was convicted of a crime. The State's principal expert recommended that L.P. not be returned to the father because the father had failed to satisfy the expert's imaginary burden to prove himself a competent father.

The trial court should have ignored, and this court must ignore, the expert evidence presented at trial. Expert testimony based on speculation and without a factual basis should not be admitted, let alone form the basis for the termination of a fundamental constitutional right. *Miller v. Likins*, 109 Wn. App. 140, 148, 34 P.3d 835 (2001). I hesitantly pen this observation because the reader may claim I am reviewing the evidence in a light favorable to the parents rather than to the State. Even if this court accepts the expert testimony, all witnesses agreed that the father is a low risk to abuse L.P. If Washington courts applied a standard of removal based on a low or speculative risk of

21

harm, Washington would devolve into Plato's republic, wherein children are raised by government appointed guardians, not parents. Plato's *Republic*, bk. 5, 464. All children are constantly at risk of harm.

A discerning reader will ask why this dissent devotes paragraphs to discussing the speculative nature of the expert opinions when the dissent also concludes that those conjectural opinions fail to support a finding of parental unfitness. I do so because a dissent should muster all reasons supporting an outcome different than ordered by the majority. The grave repercussions attendant to the appeal of a parental rights termination magnify this need for mustering. I also do so to show the cumulative unfairness meted on L.P. and his parents as a result of this termination proceeding.

----------------

The petition to terminate the mother's parental rights to L.P. did not assert that the mother's disability interfered in her ability to protect L.P. The petition to terminate the father's parental rights to L.P. did not allege that the father molested any of the male children in the household. The petition did not allege that any of the older brothers molested the daughters or that one of the brothers saw the father molest a daughter. The petition did not allege that the father taught his sons to abuse female minors. In a motion for trial continuance, the State's attorney alleged that the older brothers victimized a sister and a pervasive environment of incest enveloped the home. Still, the father was

22

never placed on notice by the State that his deficiencies included abusing a son or teaching or grooming sons to molest their sisters.

During closing, the State's attorney remarked:

> And just one last thing, I keep saying that, but honestly this time. One last thing. [sic] Is the mother's disability. There is nothing that prevents someone who is even has a disability even graver than the mother's from parenting. But mother's disability complicates matters even further in her case in light of her attitude, in light of this showing ability to protect, because she is not mobile. She is not able to get around. Not only did this allow this to happen to begin with but combine that with her attitude going forward whether she would be able to get up and go see where [L.P.] would be at all times also or whether other children within the home and any spill over from that.

RP at 1413-14. The State labels this passage as merely a "snippet." Brief, page 35.

In rebuttal, the State's counsel added:

> I'd just like to say first, as far as the mother's disability, that isn't a parental deficiency. But it is a fact of this case that impacts the mother's parental deficiency, which is her failure to protect or her ability to protect. And the mother is receiving medical care and we—and we're aware of that.

RP at 1439. When one juxtaposes the opening summation with the rebuttal closing, one discerns that the State oxymoronically asserted that the mother's disability contributed to the need to terminate her parental rights, while the State argued that the mother's disability was not a parental deficiency to be used by the superior court to terminate her rights.

In its findings, the trial court noted that L.P.'s mother could not view all events that occurred in the home since she was confined to her chair for extended periods of

23

time due to health conditions. In turn, according to the superior court, the mother could

not protect L.P. for sustained periods of time. The court wrote:

> While the mother's lack of mobility contributes to her inability
> physically to keep [L.P.] safe, the court's decision does not rest on her lack
> of mobility.

CP at 190. Thus, the mother's disability was important enough to merit a finding of fact,

but, according to the State, was not a reason for parental termination.

Both parents complain that the superior court rested its decision, at least in part, on

alleged deficiencies never pled by the State. In turn, the parents challenge the superior

court's decision on due process grounds because the State failed to give advance notice of

the allegations that the father allegedly molested a son and that the mother's disability

constituted a deficiency. The parents also argue that the State never sought to remedy

these alleged deficiencies. I do not address these contentions. I rest my dissent instead

on the failure to present clear, cogent, and convincing evidence to establish the

constitutional requirement of currently unfit parents for the child that is the subject of the

termination proceeding.

The discerning reader may ask why I analyze the lack of notice given to L.P.'s

parents regarding the claimed deficiencies when I do not rest my dissent on due process

concerns. I do so because a dissent should muster all reasons supporting an outcome

different than ordered by the majority. The grave repercussions attendant to the appeal of

a parental rights termination magnify this need for mustering. I also do so to demonstrate

the cumulative unfairness meted on L.P. and his parents as a result of this termination proceeding.

--------------

The Washington Legislature has declared that the family unit is a fundamental resource of American life which should be nurtured. RCW 13.34.020. Toward the furtherance of this principle, the legislature has resolved that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. RCW 13.34.020. The paramount goal of child welfare legislation is to reunite the child with his or her legal parents, if reasonably possible. *In re Dependency of K.N.J.*, 171 Wn.2d 568, 577, 257 P.3d 522 (2011).

Both the United States and Washington Constitutions recognize a parent's fundamental liberty interest in care and custody of her children. U.S. CONST. amends. V, XIV; WASH. CONST., art. I, § 3; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re Custody of Smith*, 137 Wn.2d 1, 27, 969 P.2d 21 (1998), *aff'd sub nom. Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (Talmadge, J., concurring in part) (plurality opinion). The fundamental liberty interest of natural parents in the care, custody, and management of their child does not evaporate simply because they have not been model parents or have lost temporary custody of their child to the State. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982). The

child also has an interest in preventing the erroneous termination of its relationship with its natural parents. *Santosky v. Kramer*, 455 U.S. 745, 765 (1982).

The United States Supreme Court has long recognized a constitutionally protected interest of parents to raise their children without state interference. *Wisconsin v. Yoder*, 406 U.S. 205, 235-36, 92 S. Ct. 1526, 32 L. Ed. 2d 15 (1972); *Pierce v. Society of Sisters of Holy Names of Jesus & Mary*, 268 U.S. 510, 534-35, 45 S. Ct. 571, 69 L. Ed. 1070 (1925); *Meyer v. Nebraska*, 262 U.S. 390, 399, 43 S. Ct. 625, 67 L. Ed. 1042 (1923). The liberty interest of parents may be the oldest of the fundamental liberty interests recognized by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Some Washingtonians deem these rights God-given rights that precede the constitution.

A long-standing tenet of Washington law declares that a parent has the natural and legal right to the custody and control of her children, unless so completely unfit for such duties that the welfare of the children imperatively demands another disposition of their custody. *In re Dependency of T.J.B.*, 115 Wn. App. 182, 187, 62 P.3d 891 (2002), *rev'd sub nom. In re Dependency of Brown*, 149 Wn.2d 836, 72 P.3d 757 (2003). Absent a showing of parental unfitness by clear and convincing evidence, the State may not terminate a parent's right to care of his or her child regardless of the State's parental termination statutes. *In re Welfare of Sego*, 82 Wn.2d 736, 738, 513 P.2d 831 (1973). Even if the State establishes the termination factors in RCW 13.34.180(1), the trial court may not terminate the rights of a currently fit parent. *Santosky v. Kramer*, 455 U.S. 745,

760 (1982); *In re Welfare of A.B.*, 168 Wn.2d 908, 919-20, 232 P.3d 1104 (2010); *In re Welfare of A.G.*, 160 Wn. App. 841, 845, 248 P.3d 611 (2011); *In re Welfare of Shantay C.J.*, 121 Wn. App. 926, 936, 91 P.3d 909 (2004).

Terminating parental rights is one of the severest of state actions and implicates fundamental interests. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116, 117 S. Ct. 555, 136 L. Ed. 2d 473 (1996); *In re Welfare of J.M.*, 130 Wn. App. 912, 921 (2005). When the state moves irrevocably to sever the parent-child bond, the rights of parents to protection from "'unwarranted usurpation'" by the state are guaranteed by the Fourteenth Amendment to the United States Constitution. *M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996); *In re Welfare of J.M.*, 130 Wn. App. 912, 921 (2005). Termination of parental rights is intended as a last resort, available only when all other reasonable efforts have failed. *S.L. v. Indiana Department of Child Services*, 997 N.E.2d 1114, 1123-24 (Ind. Ct. App. 2013).

A finding of unfitness requires more than the determination that the State proved by a preponderance of the evidence that a parenting deficiency exists. The due process clause demands the State establish unfitness by clear, cogent, and convincing evidence. *In re Welfare of A.B.*, 168 Wn.2d 908, 920 (2010); *In re Dependency of A.W.*, 53 Wn. App. 22, 29-30, 765 P.2d 307 (1988).

Identifying parenting deficiencies is not the equivalent of proving parental unfitness. *In re Dependency of Schermer*, 161 Wn.2d 927, 943, 169 P.3d 452 (2007). Terminating a parent's rights in the absence of a finding of unfitness, either expressed or

27

implied, violates due process clause protections. *In re Parental Rights to B.P.*, 186

Wn.2d 292, 312-13, 376 P.3d 350 (2016)

A father's entire parental history may bear relevance to evaluating his current

fitness to parent. *In re Dependency of Brown*, 149 Wn.2d 836, 841 (2003): *In re Welfare*

*of Ross*, 45 Wn.2d 654, 657 (1954). Nevertheless, termination of the parent-child

relationship must be based on *current* parental unfitness. *In re Dependency of*

*T.L.G.*, 126 Wn. App. 181, 203, 108 P.3d 156 (2005). When the evidence is insufficient

to support a finding that the father is deficient at the time of trial, termination is improper

even if the evidence shows that the father was deficient at an earlier time. *In re Welfare*

*of A.B.*, 168 Wn.2d 908, 920 (2010); *In re Dependency of A.N.G.*, 12 Wn. App. 2d 789,

796, 459 P.3d 1099 (2020).

The law affords no comprehensive or definitive definition of "unfitness" in the

context of parental rights termination. *In re Parental Rights to K.M.M.*, 186 Wn.2d 466,

490, 379 P.3d 75 (2016). A parent is unfit if he or she cannot meet a child's basic needs.

*In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 494 (2016); *In re Custody of*

*B.M.H.*, 179 Wn.2d 224, 236, 315 P.3d 470 (2013). A parent is unfit if she lacks the

necessary capacity for giving parental care. *In re* Welfare of *Aschauer*, 93 Wn.2d 689,

694, 611 P.2d 1245 (1980). In order to prove unfitness, the State must show that the

parent's deficiencies make him or her incapable of providing basic nurture, health, or

safety. *In re Parental Rights to B.P.*, 186 Wn.2d 292, 313 (2016). Terminations are fact

28

specific and must be decided on a case-by-case basis. *In re Welfare of N.M.*, 184 Wn. App. 665, 672, 346 P.3d 762 (2014).

-------------

No Washington decision parallels this appeal wherein the State seeks to terminate the rights of a father to a son when the evidence establishes that the father sexually molested the son's older sisters. Thus, I seek edification from foreign decisions. I first delineate principles arising from foreign decisions. I later discuss the facts of the decisions to juxtapose the circumstances surrounding the State's termination of the rights of L.P.'s parents.

No condition per se disqualifies a parent as unfit. *Department of Human Services v. B.B.*, 248 Or. App. 715, 274 P.3d 242, 248 (2012). A person's status as a sex offender does not alone justify state intervention, nor does the fact that a sex offender is untreated create a presumption of risk to the child, as required for dependency jurisdiction. *In re K.R.M.*, 296 Or. App. 109, 437 P.3d 1186, 1193 (2019). Abuse or neglect of one child cannot usually serve as the sole basis for a finding of unfitness. In *In re Christopher C.*, 73 A.D.3d 1349, 1351, 900 N.Y.S.2d 795 (2010). Physical abuse of a child's sibling cannot lead to the termination of that child's relationship with a parent unless the court finds a nexus between the abuse and prospective abuse of the subject child. *Department of Human Services v. H.L.R.*, 244 Or. App. 651, 260 P.3d 787, 800 (2011). The court should consider whether the child subject to the termination proceeding falls in the class

29

of people victimized by the parent. *In re K.R.M.*, 296 Or. App. 109, 437 P.3d 1186, 1193 (2019).

Any harm to the child must be present at the time of the hearing and not merely speculative. *In re K.R.M.*, 437 P.3d 1186, 1192 (2019). The State must present evidence of the type, degree, and duration of any projected harm. *In re K.R.M.*, 437 P.3d 1186, 1192 (2019). Potential harm is insufficient to terminate a parent's rights. *Department of Human Services v. H.L.R.*, 260 P.3d 787, 796 (2011). A court should ponder the actual detriment to the children from removal from the parents before terminating parental rights. *Department of Human Services v. H.L.R.*, 260 P.3d 787, 800 (2011).

A sex offender treatment expert's opinion that a parent poses a "potential risk" to a child does not satisfy a finding that the parent is unfit. *Department of Human Services v. B.B.*, 274 P.3d 242, 248 (2012). A court should discount opinions of experts based on generalizations rather than on observations of the children with the parents. *Department of Human Services v. H.L.R.*, 260 P.3d 787 (2011).

Some states maintain one or more statutes that create a presumption of unfitness if a parent engaged in enumerated criminal behavior. For example, Mississippi maintains a statute, which may be unconstitutional in some circumstances, that expressly declares the court may terminate the parental rights of a parent who was convicted of one of many listed crimes. MISS. CODE. ANN. § 93-15-121 (2017). The crimes include rape of a child, sexual battery of a child, touching a child for lustful purposes, and carnal

30

knowledge of a step or adopted child. A Florida statute allows the State to terminate the parental rights of an incarcerated person if the person has been adjudicated by a court of being a sexual predator. FLA. STAT. § 39.806(1)(d) (West 1987). A Pennsylvania statute directs the Commonwealth to deny a parent services in aggravated circumstances, including when the parent must register as a sex offender. 42 PA. STAT. AND CONS. STAT ANN. §§ 6302 ("Aggravated circumstances" (6)), 6341(c.1), 6351(e)(2); Pa. R.J.C.P. 1705.

Other state statutes create a presumption of unfitness based on certain behavior. For example, Utah has a statute that presumes a parent unfit if convicted of possessing child pornography. UTAH CODE ANN. §§ 80-1-102(80)(b), 80-4-301(1), 80-4-302(7)(a). Maine possesses a statute that creates a presumption of unfitness of a parent convicted of gross sexual assault or unlawful sexual contact with a minor. ME. REV. STAT. 17-A §§ 253(1)(B)-(C) (2003), 255-A (2021); ME. REV. STAT. 22 § 4035(2-A) (2001). Washington has no analogous statute that creates a presumption.

I find decisions from other jurisdictions that support the State's position and some that support L.P.'s parent's posture. Of course, each decision rests on its unique facts. The decisions with the facts closest to this pending appeal favor the father. Decisions that assist the State tend to have more lenient rules for termination than Washington State. Some states do not impose on the State a burden of demonstrating a current likelihood of harm.

31

First, I narrate the foreign decisions favoring the State. In *In re Interest of A.D.-G.*, 263 A.3d 21 (Pa. Super. Ct. 2021), *appeal denied*, 266 A.3d 449 (Pa. 2021), the reviewing court affirmed the trial court's order directing the Commonwealth to end efforts to reunify the father's relationship with his daughter. The father had sexually abused his own sister beginning when he was eleven years old and the sister was one year old. The abuse continued for ten years. The father had been adjudicated a sexually violent predator. The court noted that his daughter was the same age of his sister when the father began to abuse the sister and was of the same gender as the child he abused. The appellate court ruled that the trial court acted reasonably when it weighed the similarity between the child and the father's earlier victim.

In *In re Child of Ryan F.*, 2020 ME 21, 224 A.3d 1051, the father sexually assaulted two of his other children. The father had a conviction for gross sexual assault and unlawful sexual contact involving two of his other children. The father failed to complete sex offender treatment. The father's son was a sex offender. The deviant sexual history of the father ended 23 years before, and he had left prison. His psychologist expert testified to a very low risk of offending, 2.5 percent at the time compared to a 20.5 percent risk on release from prison. Still, the father continued to associate with other known sex offenders.

In *In re Child of Ryan F.*, the state of Maine sought an order prohibiting the father's contact with a daughter. The trial court noted that, although the father may pose

32

no more risk than someone never convicted of a sexual crime, some risk remained. The court applied the Maine statute imposing a rebuttable presumption that one convicted of a sex offense against minors would place any minor in jeopardy. The father principally argued that the Maine statute violated his due process rights under the United States Constitution. The court noted that the outcome might be different if the State sought parental termination rather than a protective order.

In *Interest of C.R.C.*, 2019 UT App 153, 450 P.3d 1169, police discovered that the father had downloaded hundreds of photographs and videos of child pornography, with some images depicting newborns and toddlers. The father became a father shortly after being arrested. The trial court adjudged the father unfit, under a state statute, by reason solely of a conviction for possessing child pornography. On appeal, the father contended that his possession of child pornography did not endanger his daughter. With little discussion, the appeals court affirmed.

In *In re KR.M.*, 296 Or. App. 109 (2019), the Oregon Court of Appeals followed an Oregon rule that allowed the appellate court to perform de novo review of a dependency order. The father had sexually abused the subject child and a sister. The reviewing court noted that the parent's status as a sex offender did not alone justify state intervention, nor did the fact that he remained untreated raise a presumption of risk to the child. Nevertheless, the father had sexually abused the subject child four times. He never engaged in treatment, nor acknowledged the harm to the child. He sexually abused

the child's sister, and the younger subject child continued to be in the class of the father's victims.

In *In re Christopher C.*, 73 A.D.3d 1349 (2010), the father was convicted of attempted sexual abuse for inappropriately touching a young niece. He admitted to sexual intercourse with a second young niece. Finally, he pled guilty to sexually abusing an eight-year-old boy. Authorities designated the father a risk level three sex offender. He failed to complete sexual offender treatment. The court recognized that abuse or neglect of another child cannot usually serve as the sole basis for a dependency, but the father's multiple instances of abuse and failure to attend treatment justified a dependency.

In *In re the Interest of King*, 15 S.W.3d 272 (Tex. Ct. App. 2000), the father sexually assaulted his niece and was sentenced to fifty years in prison. The appeals court stated that a court may infer danger to a child by parental misconduct that did not harm the child. The court affirmed the trial court's termination of the father's relationship with his daughter. According to the court, the court may infer that the sexual assault of another child living in the home will endanger or jeopardize the well-being, both physical and emotional, of other children in the home who may discover the abuse or be abused themselves. The court reasoned that a parent or caretaker who is sexually offending or physically abusing a child in the home is not normally selective about the children he abuses and that such conduct places all children in the home at risk. The court qualified its ruling by writing that the State must still present evidence that the conduct will likely

34

be repeated. The Texas statute did not require actual injury before a parent's rights could be terminated.

In *In re Welfare of H.M.P.W.*, 281 N.W.2d 188 (Minn. 1979), the father resided in prison. The father molested a fifteen-year-old female and a four-year-old female and assaulted an eighteen-year-old woman. He had never seen his children, ages 8 and 7. The trial court terminated his parental rights. The father contended on appeal that his criminal sexual conduct with a child other than his own did not justify termination. He relatedly argued that the State had failed to show that his behavior directly impacted his children. The court agreed that criminal sexual conduct did not automatically establish unfitness as a parent. Nevertheless, the court declared that the State need not show that the criminal sexual behavior directly physically affected the parent's children or that the children had observed the behavior before the father could be found unfit. Instead, the State needed only to demonstrate that the behavior would likely be detrimental to the children's physical health, mental health, or morals.

In *S.L. v. Indiana Department of Child Services*, 997 N.E.2d 1114 (Ind. Ct. App. 2013), the father was a convicted child molester. The mother repeatedly warned the government that the father was a threat. She testified that, in addition to the conduct that led to his conviction, the father stood above a sleeping child and masturbated. The father had not completed treatment due to repeated incarceration. The court affirmed an order of termination.

35

Now I appraise decisions in which reviewing courts reversed orders of dependency or parental termination. *Department of Human Services v. B.B.*, 248 Or. App. 715, 274 P.3d 242 (2012) involved a dependency. The father had sodomized both a young girl and boy sixteen years earlier and had viewed pornography a decade earlier. The State emphasized that the father had not completed recommended treatment. The State's sex offender treatment expert testified that the father posed a "potential risk." 274 P.3d at 248. No one testified, however, that a sex offender must complete treatment to remediate his conduct or condition. The reviewing court rejected the proposition that a condition per se could disqualify a parent as unfit. A potential risk from the parent did not suffice for a dependency. Instead, the State needed to show likely harm to the child. The father had lived with the children for seven years and had unsupervised contact during the last two years. The children reported no abuse. Under Oregon law, the appeals court, in a dependency action, could review the evidence de novo. Nevertheless, the court ruled that, regardless of the standard of review, the evidence did not support a finding of the father posing a current risk to his children. The Oregon court reversed the order of dependency.

In *In re Hannah U.*, 97 A.D.3d 908, 948 N.Y.S.2d 704 (2012), the court held that the father's status as a registered risk level II sex offender did not constitute per se neglect for purposes of a dependency. The father completed sex offender treatment two years before the neglect petition. The reviewing court reversed the dependency.

36

In *Department of Human Services v. H.L.R.*, 244 Or. App. 651, 260 P.3d 787 (2011), the father served a sentence for touching the clothed breasts of an eleven-year-old girl. On release from prison, the father started, but did not complete, sex offender treatment. Thereafter the father violated release conditions by maintaining contact with minors and viewing adult pornography. One psychologist opined that the father posed a low risk for sexual recidivism with respect to children. All evaluators worried about the potential that the father's penchant would cause harm to the children in the future. One psychologist predicted that the father, because of a personality disorder, would impulsively harm the children. The trial court terminated the rights of both parents to their three children on the basis of unfitness. The reviewing court discounted opinions of experts based on their generalizations rather than on observations of the children with the parents. When reversing the order of termination, the court followed the rule that potential harm is insufficient to terminate a parent's rights. The court must not ground a decision on the seriousness of the parent's conduct in the abstract. The State must show that the parent's conduct or condition is seriously detrimental to that particular child. The inquiry is child-specific and requires testimony in psychological and developmental terms regarding the particular child's requirements. The present status as a sex offender did not by itself pose a risk. The State must provide clear, cogent, and convincing evidence of unfitness at the time of termination. The court recognized the risk of the father sexually

37

abusing the children, but the risk was low. The court concluded that the children suffered more detriment by removal from their parents.

In *In re Interest of G.D.*, 870 So.2d 235 (Fla. Dist. App. 2004), the court declared that abuse of a child's sibling cannot lead to the termination of that child's relationship with a parent unless the court finds a nexus between the abuse of the sibling and the prospective abuse of the subject child. The abuse of the sibling was physical, not sexual abuse. According to the appeals court, the State established a nexus only when the parent has a mental or emotional condition that will continue, such as mental illness, drug addiction, or pedophilia, and which will make it highly probable that in the future the parent will abuse or neglect another child. The Florida appeals court quashed a trial court order compelling the parents to submit to mental examinations toward the possible end of filing a dependency petition.

In *In re Cruz*, 164 Or. App. 178, 990 P.2d 922 (1999), the father resided with the mother of three boys from another relationship. The father admitted past sexual conduct with minor girls other than family members. When age 17, the father sexually abused his 13-year-old stepsister. Five years later, he pled guilty to third degree rape. We do not know the age of the rape victim. The father had delayed a sex offender evaluation. He indicated a willingness for treatment, but he could not afford the cost. The father's seven-year-old son from another relationship maintained a bedroom in the home without any indication of abuse. The State sought to terminate parental rights in a newborn. The

trial court denied termination because of an absence of evidence of any improper conduct toward the father's children or any other prepubescent child. On appeal, the State contended the father was unfit because he previously engaged in sexual conduct with minors and had not adjusted his conduct. The court applied the rule that evidence of an underlying problem is not, by itself, sufficient to declare a parent unfit.

This court's majority opinion criticizes this dissent for perusing foreign decisions particularly because the decisions reach various results based on differing state statutes. Nevertheless, my analysis takes into consideration the variety of state statutes. More importantly, the test for a finding of an unfit parent cannot vary from state to state since the United States constitution's due process clause demands this finding.

This court's majority opinion fails to cite any case, let alone a Washington decision, that addresses the situation wherein the State terminates the parental rights of a father and mother when the father molested two daughters but never molested a son, let alone the son in question. The majority opinion does not explain why principles announced in foreign decisions cannot apply under Washington statutes. The majority opinion provides no substitute for the dissent's foreign state analysis of unfitness in the context of child molestation. Sometimes a judge learns valuable lessons and gains perceptive insights by reviewing foreign decisions.

------------------

I now analyze the evidence presented by the State in the trial to terminate the parents' rights to L.P. In doing so, I focus on one finding of fact that declares the father unfit to parent any child. I examine whether clear, cogent, and convincing evidence supported this finding. Contrary to the majority's accusation, I do not reweigh or ignore any evidence. I reasonably construe the evidence in favor of the State. In turn, the majority performs little analysis of the facts of alleged current unfitness to parent L.P. other than to parrot the superior court's conclusory finding that the father is unfit to parent any child.

The majority declares that the father did not preserve, raise, or brief my conclusion that the facts did not support a finding of an unfit parent. To the contrary, the father assigned error to the trial court's finding. I quote from the father's appeal brief:

> 6. The father assigns error to the finding of fact 2.14.103 stating the father is currently unfit to parent.

Appellant's Opening Br. at 3. The father discusses this assignment of error in combination with other assignments of error on pages 9 to 16 of his brief.

The superior court found the primary deficiency of the father to be sexual abuse. Although the court inserted the qualifier "primary," the court discerned no secondary deficiency.

The key finding of fact entered by the superior court reads:

40

> The court finds that [L.P.]'s young age makes him more vulnerable compared to a child into their teens and is mindful of the ages of [A.P.] and [R.P.] when they were abused. The evidence establishes that the father presents a present risk of harm to all children in his care, including [L.P.], and thus is currently unfit to parent.

CP at 161. The finding did not specify the purported risk in concrete terms or in statistical terms used by psychologists. In this critical finding of fact, the superior court did not identify the discrete evidence on which it determined that the father was unfit to parent L.P., let alone all children.

Courts universally declare that, when the trial court makes a conclusory finding without specific findings of the important underlying facts necessary to support the ultimate conclusions, the reviewing court may, if not must, make an independent scrutiny of the record to determine whether those underlying facts are present. *In re Dependency of Q.S.*, 22 Wn. App. 2d 586, 610, 515 P.3d 978, 990-91 (2022). Based on an independent review of admissible evidence in the appeal before us and the few helpful expert opinions, the State cannot by clear, cogent, and convincing evidence, let alone by a preponderance of evidence, sustain the trial court's key finding of fact of unfitness.

The basis for a finding of unfitness was the father's molestation of his two daughters and his refusal to empathize with them because he denies his conduct. I do not dispute that the rapes of his daughters caused horrific and long-term harm to the daughters. I agree the conduct justified terminating the father's relationship to R.P. But this egregious wrong did not create harm to L.P. or pose a risk of harm, particularly when

L.P. lacked knowledge of the abuse. The only expert who commented about any possible actual current harm to L.P. was Jessica Johnson, who averred that a child would not suffer harm from abuse of a sibling if the child did not know of the abuse.

I compare the facts presented by the State against the father with the facts in the foreign decisions I previously reviewed. L.P.'s father has not been adjudged guilty of any crime, yet alone been declared a sexually violent predator. He need not register as a sex offender. The father abused only daughters and began that abuse at an age when the daughters were younger than the age of L.P. The State does not allege any abuse toward L.P. Even if I assumed that C.P. learned to molest his sister from observing his father, no daughters remain in the father's household.

Psychologists who evaluated the father lumped him into a category and then generalized based on the category rather than observing the father's interaction with L.P. None of the psychologists examined or evaluated L.P., a key flaw in the psychologists' opinions. The superior court terminated the father's parental rights based on expert witness testimony that assumed the father was a convicted sex offender, when the father is not a convicted sex offender. The State might argue that the father's rights were not taken because of expert witness testimony but because of the compelling testimony of his daughters. But the fact that the father raped his daughters does not automatically lead to termination of rights to a son. The State needed something more, and that something more was expert testimony that the father was a current and likely risk to L.P. The State

needed to demonstrate a nexus between the father's behavior toward the daughters and potential harm to L.P. L.P. lived with the father for many years without any abuse. All the actuarial evidence showed any risk to be very low.

The majority opinion emphasizes Dr. Jameeson Lontz's testimony that the father's willingness to commit egregious violent acts toward one vulnerable individual increases the risk that he will victimize other vulnerable individuals. I accept this testimony, but an increase in a risk of some event does not render the event likely to happen. Dr. Lontz never testified that the father will likely abuse the son, let alone place any percentage of risk or increase in risk on this happening.

The trial court impliedly found that the father is not fit to parent any child when the court found that the father poses a risk to "all children in his care." CP at 189. The superior court did not find that the father was unfit to parent L.P., but rather "unfit to parent." The State may consider this uncategorical finding to bolster its position. I discern the finding to puncture the State's case.

One might maintain that the superior court must have found that the father cannot safely parent L.P., because after all L.P. is "any child" within the meaning of the critical finding of fact. Yet, the trial court must focus on the specific child at issue. The decisive finding illustrates that the trial court resolved the case based on generalities rather than concrete evidence. The superior court's finding shows that the court was abstractly concluding that anyone who molested girls cannot safely parent a son and no matter the

43

passage in time. No Washington statute creates a per se rule that any sexual misconduct leads to termination of parental rights. No case proposes that a parent automatically loses his parental rights to a child by reason of molesting another child.

In one of its concluding paragraphs, the majority writes:

> The parents claim that there is no problem with L.P. because there is no finding that he was sexually abused. They do not acknowledge the impact of secondary trauma on L.P. from exposure to the abuse of his sisters or the potential for L.P. to become an abuser like his brothers. They seem to imply that without the daughters in the home, the problem is gone. Such assertion reflects their ongoing deficiency. If returned, L.P. will continue to suffer the impact and influence of his father['s] and brothers' sexually deviant behavior on his own behavior. The risk remains that L.P. will be taught to abuse as his older brothers were taught.

Majority at 39-40. This passage extends beyond the allegations of the State, strays from trial evidence, lacks any basis in expert testimony, conflicts with N.P.'s experience, finds no support in the trial court findings of fact, and excoriates L.P.'s mother without recognizing her impossible circumstances. The passage invents a problem and then criticizes the mother for failing to acknowledge the invented problem.

No substantive evidence supports the conclusory statement that the father taught the older brothers to abuse. No trial statements suggested that L.P. was exposed to the abuse of his sisters. No testimony hinted that L.P. suffered secondary trauma due to any abuse of his sisters. No evidence intimated that L.P. ever suffered, let alone will continue to suffer, the impact and influence of his father's and brothers' sexually deviant behavior. No expert suggested that L.P. has the potential, let alone, will likely become an abuser.

44

No expert averred that any behavior of the father or brothers has influenced L.P.'s behavior or will influence his behavior in the future. No psychologist or social worker surmised that L.P. is at any risk to be taught to abuse minors. The State does not even assert that the father groomed C.P. or B.P. to molest his sisters, that L.P. was exposed to the abuse of his sisters, that L.P. suffered secondary trauma due to any abuse of his sisters, or that L.P. will likely become an abuser.

N.P., the third oldest son, resided safely in his home without any abuse or knowledge of abuse. N.P. was not taught to abuse young women.

In *Rodriguez v. Zavala*, 188 Wn.2d 586, 398 P.3d 1071 (2017), the Supreme Court addressed the issue of whether domestic violence unseen by a child should result in a restraining order in favor of the child against the father. The court reasoned that domestic violence toward a parent to another parent permeates the home and impacts the children in the home. In addition to witnessing violence, hearing and seeing its effects on loved ones may harm a child's brain development and lead to learning disabilities, put children under emotional stress, and contribute to an increase in anxiety, sleep disorders, and posttraumatic stress disorder. The young child may have heard violent acts committed by his father on his mother.

In this appeal, the State does not contend, the State does not cite to any literature, and no expert witness claimed that child molestation permeates the entire atmosphere in a home. No court decision has posited that the abuse of one child necessarily ruins the

household to the extent that all other children must be removed. Domestic violence is often performed openly. Child molestation is usually done secretly. The State does not argue that paraphilia passes in the genes from father to son. To repeat and to reemphasize, Jessica Johnson, the only witness to testify as to actual harm to L.P., averred that the molestation of the daughters would not impact L.P. as long as L.P. lacked knowledge of the molestation.

The majority opinion's concluding paragraph quoted above, despite being factually erroneous and legally unsound, might be excused if the paragraph limited its condemnation to the father because of his egregious behavior against his daughters. But the paragraph envelopes the mother in its censure and packages her omissions with the venal acts of her husband. The majority writes: "*They* do not acknowledge the impact of secondary trauma." "Such assertion reflects *their* ongoing deficiency." Majority at 39-40 (Emphasis added).

The superior court found that the mother would not separate from the father because of an unwillingness to believe that her husband sexually abused their daughters. This finding ignores the possibility that the mother may reasonably doubt the allegations of the daughters based on her knowledge of her daughters, confirmed by the State's prosecuting attorney dropping the criminal charges. Despite disbelieving R.P. who asserted she suffered abuse, the mother still acted reasonably. She agreed to the termination of her rights to R.P. Nevertheless, the State still condemned the mother and

46

forced her to decide between two unacceptable and unbearable options: leave her husband or sever her bonds and the loving relationship with her youngest living son.

The mother refused to abandon her husband for reasons more than a disbelief of the daughters. Amy Ford, the mother's psychological evaluator, testified that the mother refused to leave her husband because the husband is her sole support. State social workers echoed this conclusion. The superior court found the father to be the sole financial provider for the family.

Condemnation of L.P.'s mother for her refusal to leave the father ignores her economic vulnerability and exemplifies the hardships imposed on the poor in dependency and termination proceedings. A wealthy and healthy mother would be more likely to leave her husband to maintain a relationship with her son. Instead of blaming the mother for her vulnerabilities, the State could have offered material support to the mother. If the State had afforded the mother a sustainable income to allow her to raise L.P. on her own and she had accepted the offer, the State might have gained financially because it would have saved the cost of years of foster care, the expense of employing social workers, the indirect cost of utilizing the court system, and the expense of attorneys and guardians for L.P. and his parents.

By dissenting, I do not ignore the terror inflicted on A.P. and R.P. by the father. Nevertheless, I cannot allow my disgust for the father's abuse of his daughters to guide my decision. I cannot base my judgment on a desire to punish the father for his behavior

47

toward his daughters. Most importantly, I must instead focus on the lifelong psychological trauma to be suffered by L.P. because of the State's severing of him from the most primal of his relationships, his connection to his parents, with whom he bonded during his formative years. The gravity of this harm to L.P. and the State's infliction of similar emotional pain on many other children needlessly removed from parents has motivated the tone and length of this dissent.

--------------

The father on some days and the mother on all days appeared remotely by zoom for the trial. Some witnesses also testified remotely. In the findings of fact and order, presumably drafted by the State, the superior court described in detail the technology employed by the court, the precautions taken by the court to ensure the technology functioned correctly, and the ability of the court to observe the expressions and mannerisms of the witnesses. I commend the State and the superior court for the thorough narrative of this critical aspect of the trial and the precautions taken to ensure procedural due process.

_____
Fearing, J.
